**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

STATE OF RHODE ISLAND

      *Plaintiff*,

vs.

CHEVRON CORP.;
CHEVRON U.S.A. INC.;
EXXONMOBIL CORP.;
BP P.L.C.;
BP AMERICA, INC.;
BP PRODUCTS NORTH AMERICA, INC.;
ROYAL DUTCH SHELL PLC;
MOTIVA ENTERPRISES, LLC;
SHELL OIL PRODUCTS COMPANY LLC;
CITGO PETROLEUM CORP.;
CONOCOPHILLIPS;
CONOCOPHILLIPS COMPANY;
PHILLIPS 66;
MARATHON OIL COMPANY;
MARATHON OIL CORPORATION;
MARATHON PETROLEUM CORP.;
MARATHON PETROLEUM COMPANY LP;
SPEEDWAY LLC;
HESS CORP.;
LUKOIL PAN AMERICAS, LLC;
GETTY PETROLEUM MARKETING, INC.;
AND
DOES 1 through 100, inclusive,

      *Defendants*.

Case Number: 1:18-cv-00395-WES-LDA

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION TO REMAND TO STATE COURT**

[Removal from the Providence Superior Court of Rhode Island, C.A. No. PC-2018-4716]

# TABLE OF CONTENTS

I.      **INTRODUCTION** .............................................................................................. 1

II.    **RELEVANT LEGAL STANDARDS** ............................................................. 2

III.   **ARGUMENT** .................................................................................................... 4

      A.   Federal Common Law Does Not Confer Federal Jurisdiction over Rhode Island's Purely State Law Claims ........................................................................... 4

            1.   *AEP* and *Kivalina* Held that the Clean Air Act Displaced the Federal Common Law, and Expressly Reserved Ruling on State Law Claims. .......... 5

                  a.   *AEP* Held Only That Federal Common Law Is Displaced; Because It No Longer Exists, Federal Common Law Also Does Not "Control" Rhode Island's State Law Claims. ........................................................ 5

                  b.   *Kivalina* Also Held Only That Federal Common Law is Displaced. ...... 7

                  c.   Defendants' Remaining Arguments Concerning *Ouellette* Implicate Only Non-Jurisdictional Ordinary Preemption. .................................... 10

            2.   Defendants' Arguments That Displaced Federal Common Law "Provides an Independent Basis for Federal-Question Jurisdiction" Contradicts All Controlling Appellate Authority. ................................................................. 11

            3.   Defendants' Argument That the Clean Air Act's Displacement of Federal Common Law Made State Law Claims Unavailable Is Plainly an Ordinary Defensive Preemption Argument. ................................................................. 13

      B.   Rhode Island's State Law Claims Do Not Support *Grable* Jurisdiction. ................ 15

            1.   No Question of Federal Law Is a Necessary Element of Any Claim Here. ... 16

                  a.   Defendants' Invocation of Foreign Affairs Misconstrues the State's Claims, and Does Not Supply Any Basis for Grable Removal. ............ 16

                  b.   The State's Claims Do Not "Require Federal-Law-Based" Cost–Benefit Balancing. ........................................................................ 19

                  c.   The State's Claims Are Not Collateral Attacks on Federal Regulation. 21

                  d.   The Claims Here Do Not "Implicate" Federal Duties to Disclose. ....... 22

            2.   Federal Questions Are Not Disputed in the Complaint, and Would Not Meet *Grable*'s Substantiality Requirement If They Were. .......................... 24

                  a.   There Are No Disputed Federal Questions. .......................................... 24

                  b.   No Substantial Federal Question Is Raised. .......................................... 24

                  c.   Federal Jurisdiction Here Would Upset Principles of Federalism. ........ 25

C.  No Federal Statute Completely Preempts the Complaint's State Law Claims. ....... 26

    1.  Complete Preemption Does Not Apply Because the State's Claims Are Outside the Scope of the Clean Air Act. ...................................... 27

    2.  Defendants' Ordinary Preemption Arguments Do Not Give Rise to Removal Jurisdiction. ................................................................. 30

D.  The Claims Are Not Based on Defendants' Activities on Federal Lands or at the Direction of the Federal Government. ..................................... 31

    1.  There Is No Outer Continental Shelf Lands Act Jurisdiction. ...................... 31

    2.  The State's Claims Do Not "Arise" Within the Federal Enclave. ................. 33

        a.  The State's Claims "Arise" Where the State Has Been Injured—on Non-Federal Land. ................................................... 33

        b.  Defendants Cannot Show "All Pertinent Events" Occurred on a Federal Enclave. .................................................. 34

E.  Defendants Were Not "Acting Under" Federal Officers in Their Tortious Conduct. ................................................................................ 35

    1.  Standard Oil's Operations Under the Elk Hills Reserve Contract Have No Causal Nexus to the State's Injuries. ......................................... 36

    2.  Defendants' Conduct Pursuant to OCSLA Leases or NEXCOM Contracts Was Not Controlled by the Federal Government and Has No Causal Nexus with the State's Injuries. ............................................... 38

F.  This Court Lacks Jurisdiction Under the Bankruptcy Removal Statutes. .............. 41

    1.  The State Brings This Action to Enforce Its Police and Regulatory Powers Under Both the Public Policy and Pecuniary Interest Tests. ........................ 41

    2.  The State's Action Is Not "Relate[d] to" Any Bankruptcy Proceedings. ..... 41

    3.  Equitable Remand Is Appropriate. .............................................. 42

G.  Admiralty Jurisdiction Is Not Grounds for Removal. ............................... 43

    1.  Admiralty Jurisdiction Alone Cannot Serve as Grounds for Removal. ........ 43

    2.  The State's Claims Are Not Governed by Admiralty. ............................ 43

IV.  CONCLUSION ................................................................ 45

# TABLE OF AUTHORITIES

**Cases**

*Aetna Health Inc. v. Davila*,
542 U.S. 200 (2004) .................................................................................................. 27

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003) ...................................................................................... 18, 19, 26

*American Electric Power Co. v. Connecticut*,
564 U.S. 410 (2011) ........................................................................................... *passim*

*Averill v. Fiandaca*,
No. 2:17-CV-00287-JDL, 2017 WL 4419242 (D. Me. Oct. 5, 2017) ...................... 44

*Babcock Servs., Inc. v. CH2M Hill Plateau Remediation Co.*,
No. 13-CV-5093-TOR, 2013 WL 5724465 (E.D. Wash. Oct. 21, 2013) ................. 12

*Bader Farms, Inc. v. Monsanto Co.*,
No. 1:16-CV-299 SNLJ, 2017 WL 633815 (E.D. Mo. Feb. 16, 2017) ................... 23

*Bailey v. Monsanto Co.*,
176 F. Supp. 3d 853 (E.D. Mo. 2016) ................................................................... 40

*Ballard v. Ameron Int'l Corp.*,
No. 16-CV-06074-JSC, 2016 WL 6216194 (N.D. Cal. Oct. 25, 2016) ............... 34, 35

*Barker v. Hercules Offshore, Inc.*,
713 F.3d 208 (5th Cir. 2013) ................................................................................. 45

*Bd. of Commissioners of Se. Louisiana Flood Prot. Auth.-E. v. Tennessee Gas Pipeline Co., L.L.C.*,
850 F.3d 714 (5th Cir. 2017) ...................................................................... 19, 20, 23

*Bell v. Cheswick Generating Station*,
734 F.3d 188 (3d Cir. 2013), cert. denied, 134 S. Ct. 2696 (2014) .................... 7, 31

*Bennett v. Sw. Airlines Co.*,
484 F.3d 907 (7th Cir. 2007) ................................................................................. 22

*Benson v. Russell's Cuthand Creek Ranch, Ltd.*,
183 F. Supp. 3d 795 (E.D. Tex. 2016) ................................................................... 36

*Bordetsky v. Akima Linguistics Servs., LLC*,
No. CV 14-1786 (NLH/JS), 2016 WL 614408 (D. N.J. Feb 16, 2016) ................... 34

*Boudreaux v. Global Offshore Res., LLC*,
No. 14–2507, 2015 WL 419002 (W.D. La. Jan. 30, 2015) ..................................... 43

*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001) ................................................................................................ 22, 23

*California Dump Truck Owners Ass'n v. Nichols*,
  784 F.3d 500 (9th Cir. 2015) ............................................................................................ 30

*Cassidy v. Murray*,
  34 F. Supp. 3d 579 (D. Md. 2014) ..................................................................................... 43

*Castrignano v. E.R. Squibb & Sons, Inc.*,
  546 A.2d 775 (R.I. 1988) ................................................................................................... 29

*Caterpillar Inc. v. Williams*,
  482 U.S. 386 (1987) ....................................................................................................... 3, 13

*City of Milwaukee v. Illinois & Michigan*,
  451 U.S. 304 (1981) ................................................................................................... 6, 9, 10

*City of Oakland v. BP P.L.C.*,
  No. C 17-06011 WHA, 2018 WL 3109726 (N.D. Ca. June 25, 2018) .................................. 26

*Colon-Rodriguez v. Astra/Zeneca Pharm., LP*,
  831 F. Supp. 2d 545 (D.P.R. 2011) ...................................................................................... 4

*Corley v. Long-Lewis, Inc.*,
  688 F. Supp. 2d 1315 (N.D. Ala. 2010) .............................................................................. 35

*Coronel v. AK Victory*,
  1 F. Supp. 3d 1175 (W.D. Wash. 2014) ............................................................................. 43

*Counts v. Gen. Motors, LLC*,
  237 F. Supp. 3d 572 (E.D. Mich. 2017) ............................................................................. 29

*County of San Mateo v. Chevron Corp.*,
  294 F. Supp. 3d 934 (N.D. Cal. 2018) ........................................................................ *passim*

*Crosby v. National Foreign Trade Council*,
  530 U.S. 363 (2000) ........................................................................................................... 18

*Danca v. Private Health Care Sys., Inc.*,
  185 F.3d 1 (1st Cir. 1999) ............................................................................................. 30, 32

*Enforcement Section of Massachusetts Sec. Div. of Office of Sec'y of Commonwealth v.
  Scottrade, Inc.*,
  No. CV 18-10508-NMG, 2018 WL 3946465 (D. Mass. Aug. 16, 2018) .......................... 12, 13

*Faulk v. Owens-Corning Fiberglass Corp.*,
  48 F. Supp. 2d 653 (E.D. Tex. 1999) .................................................................................. 38

*Fayard v. Ne. Vehicle Servs., LLC,*
533 F.3d 42 (1st Cir. 2008) ........................................................................... 28, 31

*Flores-Flores v. Horizon Lines of Puerto Rico, Inc.,*
875 F. Supp. 2d 90 (D.P.R. 2012) ........................................................................ 4

*Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California,*
463 U.S. 1 (1983) .................................................................................... 16, 19, 21

*Freeman v. Grain Processing Corp.,*
848 N.W.2d 58 (Iowa 2014) ............................................................................... 28

*Freiberg v. Swinerton & Walberg Prop. Servs., Inc.,*
245 F. Supp. 2d 1144 (D. Colo. 2002) ............................................................... 36

*Genusa v. Asbestos Corp.,*
18 F. Supp. 3d 773 (M.D. La. 2014) .................................................................. 43

*Gingery v. City of Glendale,*
831 F.3d 1222 (9th Cir. 2016) ...................................................................... 16, 17

*Gonzalez v. Red Hook Container Terminal LLC,*
No. 16:CV-5104 (NGG), 2016 WL 7322335 (E.D.N.Y. Dec. 15, 2016) ................. 43

*Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing,*
545 U.S. 308 (2005) ..................................................................................... *passim*

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie,*
508 F. Supp. 2d 295 (D. Vt. 2007) ...................................................................... 8

*Gregoire v. Enter. Marine Servs., LLC,*
38 F. Supp. 3d 749 (E.D. La. 2014) .................................................................... 43

*Grynberg Production Corp. v. British Gas, p.l.c.,*
817 F. Supp. 1338 (E.D. Tex. 1993) ................................................................... 25

*Gunn v. Minton,*
568 U.S. 251 (2013) ........................................................................................... 15

*Hammond v. Phillips 66 Co.,*
No. 2:14CV119-KS-MTP, 2015 WL 630918 (S.D. Miss. Feb. 12, 2015) .......... 32, 33

*Herb's Welding, Inc. v. Gray,*
470 U.S. 414 (1985) ........................................................................................... 45

*Hilbert v. Aeroquip, Inc.,*
486 F. Supp. 2d 135 (D. Mass. 2007) ................................................................. 35

*Holdren v. Buffalo Pumps, Inc.,*
614 F. Supp. 2d 129 (D. Mass. 2009) ................................................................. 38

*In re Agent Orange Prod. Liab. Litig.*,
635 F.2d 987 (2d Cir. 1980) ............................................................................................... 8

*In re Boston Reg'l Medical Center, Inc.*,
410 F.3d 100 (1st Cir. 2005) ............................................................................................. 42

*In re Katrina Canal Breaches Litig.*,
324 F. App'x 370 (5th Cir. 2009) ...................................................................................... 45

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litig.*,
725 F.3d 65 (2d Cir. 2013) ............................................................................................... 26

*In re National Security Agency Telecommunications Records Litig.*,
483 F. Supp. 2d 934 (N.D. Cal. 2007) .............................................................................. 25

*In re Pegasus Gold Corp.*,
394 F.3d 1189 (9th Cir. 2005) .......................................................................................... 42

*In re Ray*,
624 F.3d 1124 (9th Cir. 2010) .......................................................................................... 41

*In re Resorts Int'l, Inc.*,
372 F.3d 154 (3d Cir. 2004) ............................................................................................. 41

*In re Roundup Prod. Liab. Litig.*,
No. 16-MD-02741-VC, 2017 WL 3129098 (N.D. Cal. July 5, 2017) .......................... 20, 22

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
264 F. Supp. 3d 1040 (N.D. Cal. 2017) ............................................................................ 29

*In re Volkswagen "Clean Diesel" Litig.*,
No. CL-2016-9917, 2016 WL 10880209 (Va. Cir. Ct. 2016) ........................................... 29

*In re Wilshire Courtyard*,
729 F.3d 1279 (9th Cir. 2013) .......................................................................................... 42

*International Paper Co. v. Ouellette*,
479 U.S. 481 (1987) .......................................................................................................... 10

*Jackson v. Johns-Manville Sales Corp.*,
750 F.2d 1314 (5th Cir. 1985) ............................................................................................ 8

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
513 U.S. 527 (1995) ..................................................................................................... 44, 45

*Jet Aviation, Inc. v. City of Cleveland, Ohio*,
409 U.S. 249 (1972) .......................................................................................................... 44

*Klausner v. Lucas Film Entm't Co.*,
No. 09-03502 CW, 2010 WL 1038228 (N.D. Cal. Mar. 19, 2010) ................................... 34

*Kurns v. R.R. Friction Prod. Corp.*,
565 U.S. 625 (2012) ................................................................................................ 26

*Lawless v. Steward Health Care Sys., LLC*,
894 F.3d 9 (1st Cir. 2018) .............................................................................. 4, 11, 15

*López-Muñoz v. Triple-S Salud, Inc.*,
754 F.3d 1 (1st Cir. 2014) ......................................................................................... 3

*Massachusetts v. E.P.A.*,
549 U.S. 497 (2007) ................................................................................................ 26

*McCarty v. Precision Airmotive Corp.*,
No. 806CV1391T26TBM, 2006 WL 2644921 (M.D. Fla. Sept. 14, 2006) ............ 20

*McKay v. City & Cty. of San Francisco*,
No. 16-CV-03561 NC, 2016 WL 7425927 (N.D. Cal. Dec. 23, 2016) ............. 21, 26

*MDS (Canada) Inc. v. Rad Source Techs., Inc.*,
720 F.3d 833 (11th Cir. 2013) ................................................................................ 24

*Merrick v. Diageo Americas Supply, Inc.*,
805 F.3d 685 (6th Cir. 2015) ............................................................................. 8, 31

*Messerlian v. A.O. Smith Corp.*,
No. C.A. 09-393 S, 2010 WL 308981 (D.R.I. Jan. 25, 2010) ................................ 42

*Messier v. Ace Am. Ins. Co.*,
No. 12-CV-892-JD, 2013 WL 5423716 (D.R.I. Sept. 26, 2013) ............................ 44

*Metheny v. Becker*,
352 F.3d 458 (1st Cir. 2003) ..................................................................................... 4

*Metro. Life Ins. Co. v. Taylor*,
481 U.S. 58 (1987) ............................................................................................. 3, 13

*Meyers v. Chesterton*,
No. CIV.A. 15-292, 2015 WL 2452346 (E.D. La. May 20, 2015) .......................... 38

*Moreno v. Ross Island Sand & Gravel Co.*,
No. 2:13-CV-00691-KJM, 2015 WL 5604443 (E.D. Cal. Sept. 23, 2015) ............ 43

*Narragansett Indian Tribe v. R.I. Dept. of Transp.*,
___ F.3d ___, 2018 WL 4140270 (1st Cir. Aug. 30, 2018) .................................... 20

*Native Village of Kivalina v. ExxonMobil Corp.*,
696 F.3d 849 (9th Cir. 2012) .......................................................................... 5, 7, 14

*Nat'l Audubon Soc. v. Dep't of Water*,
869 F.2d 1196 (9th Cir. 1988) ................................................................................ 26

*Natural Resources Defense Council, Inc. v. Hodel*,
 865 F.2d 288 (D.C. Cir. 1988) ............................................................................ 39

*Negrón-Fuentes v. UPS Supply Chain Sols.*,
 532 F.3d 1 (1st Cir. 2008) .................................................................................... 4

*New England Legal Found. v. Costle*,
 666 F.2d 30 (2d Cir. 1981) ................................................................................. 30

*New Jersey Dep't of Envtl. Prot. v. Exxon Mobil Corp.*,
 381 F. Supp. 2d 398 (D.N.J. 2005) .................................................................... 38

*New SD, Inc. v. Rockwell Int'l Corp.*,
 79 F.3d 953 (9th Cir. 1996) ................................................................................ 12

*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
 514 U.S. 645 (1995) ........................................................................................... 30

*New York v. B.P. P.L.C.*,
 __ F.3d__, 2018 WL 3475470 (S.D.N.Y. July 19, 2018) ................................. 26

*Organic Consumers Ass'n v. Gen. Mills, Inc.*,
 235 F. Supp. 3d 226 (D.D.C. 2017) .................................................................... 22

*Par. of Plaquemines v. Total Petrochem. & Ref. USA, Inc.*,
 64 F. Supp. 3d 872 (E.D. La. 2014) .................................................................... 31

*Parlin v. DynCorp Int'l, Inc.*,
 579 F. Supp. 2d 629 (D. Del. 2008) .................................................................... 39

*Patrickson v. Dole Food Co.*,
 251 F.3d 795 (9th Cir. 2001), aff'd in part, cert. dismissed in part, 538 U.S. 468 (2003) ....... 18

*People of State of California v. Gen. Motors Corp.*,
 No. C06-05755 MJJ, 2007 WL 2726871 (N.D. Cal. Sept. 17, 2007) ................. 26

*Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*,
 559 F.3d 772 (8th Cir. 2009) .............................................................................. 21

*Plaquemines Par. v. Palm Energy Offshore, LLC*,
 No. CIV.A. 13-6709, 2015 WL 3404032 (E.D. La. May 26, 2015) ................... 32

*Provincial Government of Marinduque v. Placer Dome, Inc.*,
 582 F.3d 1083 (9th Cir. 2009) ...................................................................... 17, 18

*Raytheon Co. v. Alliant Techsystems, Inc.*,
 No. CIV 13-1048-TUC-CKJ, 2014 WL 29106 (D. Ariz. Jan. 3, 2014) ............. 12

*Reed v. Fina Oil & Chem. Co.*,
 995 F. Supp. 705 (E.D. Tex. 1998) ..................................................................... 35

*Rhode Island Fishermen's All., Inc. v. Rhode Island Dep't Of Envtl. Mgmt.*,
585 F.3d 42 (1st Cir. 2009) ................................................................................ 11, 16

*Rivet v. Regions Bank of Louisiana*,
522 U.S. 470 (1998) ................................................................................................ 3

*Rocky Mountain Farmers Union v. Corey*,
730 F.3d 1070 (9th Cir. 2013) ............................................................................... 8

*Romero v. Int'l Terminal Operating Co.*,
358 U.S. 354 (1959) .............................................................................................. 43

*Ronquille v. Aminoil Inc.*,
No. CIV.A. 14-164, 2014 WL 4387337 (E.D. La. Sept. 4, 2014) .......................... 33

*Rossello-Gonzalez v. Calderon-Serra*,
398 F.3d 1 (1st Cir. 2004) ................................................................................. 4, 33

*Rosseter v. Indus. Light & Magic*,
No. C 08-04545 WHA, 2009 WL 210452 (N.D. Cal. Jan. 27, 2009) .................... 34

*Ry. Labor Executives Ass'n v. Pittsburgh & Lake Erie R. Co.*,
858 F.2d 936 (3d Cir. 1988) ........................................................................... 13, 14

*Ryan v. Hercules Offshore, Inc.*,
945 F. Supp. 2d 772 (S.D. Tex. 2013) ................................................................. 43

*Sam L. Majors Jewelers v. ABX, Inc.*,
117 F.3d 922 (5th Cir. 1997) ................................................................................ 12

*Savoie v. Huntington Ingalls, Inc.*,
817 F.3d 457 (5th Cir.), cert. denied, 137 S. Ct. 339 (2016) ................................ 40

*Shanks v. Dressel*,
540 F.3d 1082 (9th Cir. 2008) .............................................................................. 24

*Snow v. Bechtel Const. Inc.*,
647 F. Supp. 1514 (C.D. Cal. 1986) ..................................................................... 35

*State St. Bank & Tr. Co. v. Denman Tire Corp.*,
240 F.3d 83 (1st Cir. 2001) ............................................................................ 12, 13

*Sullivan v. Am. Airlines, Inc.*,
424 F.3d 267 (2d Cir. 2005) ................................................................................. 14

*Takacs v. Am. Eurocopter, L.L.C.*,
656 F. Supp. 2d 640 (W.D. Tex. 2009) ................................................................ 36

*Tennessee Gas Pipeline v. Houston Cas. Ins. Co.*,
87 F.3d 150 (5th Cir. 1996) ................................................................................. 31

*Tobar v. United States*,
  639 F.3d 1191 (9th Cir. 2011) ................................................................... 44

*Totah v. Bies*,
  No. C 10-05956 CW, 2011 WL 1324471 (N.D. Cal. Apr. 6, 2011) .......................................... 34

*United States v. Standard Oil Co. of California*,
  545 F.2d 624 (9th Cir. 1976) ................................................................... 37

*Ware v. N. Cent. Indus., Inc.*,
  No. 6:17-CV-01287-MC, 2017 WL 5569258 (D. Or. Nov. 20, 2017)................................ 20

*Warner v. Atkinson Freight Lines Corp.*,
  350 F. Supp. 2d 108 (D. Me. 2004) ................................................................... 4

*Washington v. Monsanto Co.*,
  274 F. Supp. 3d 1125 (W.D. Wash. 2017)............................................................. 33

*Watson v. Philip Morris Companies, Inc.*,
  551 U.S. 142 (2007)................................................................... 35, 36, 39

*Wayne v. DHL Worldwide Express*,
  294 F.3d 1179 (9th Cir. 2002) ................................................................... 12

## <u>Statutes</u>

28 U.S.C. § 1331................................................................... 12, 44

28 U.S.C. § 1441................................................................... 43

28 U.S.C. § 1444................................................................... 43

28 U.S.C. § 1452................................................................... 42

42 U.S.C. § 7401................................................................... 1, 26, 31

42 U.S.C. § 7416................................................................... 26, 31

42 U.S.C. § 7543................................................................... 29, 30

42 U.S.C. § 7604................................................................... 26, 31

42 U.S.C. § 7607................................................................... 27, 30

## I.    INTRODUCTION

Rhode Island maintains well-established state law causes of action for concrete injuries to its own citizens, infrastructure, and natural resources, sounding in public nuisance, product liability, trespass, impairment of public trust resources, and the State Environmental Rights Act. State's Motion for Remand, Dkt. 40 ("Mot.") at 5–6. Defendants' Notice of Removal and Joint Opposition to Plaintiff's Motion to Remand, Dkt. 87 ("Opp."), drastically and fundamentally misconstrue the substance of the State's constitutional, common law, and statutory claims, spinning numerous grounds for removal out of fabrications found nowhere in the Complaint. Contrary to Defendants' relentless assertions, the State's claims do not seek to "reshape the Nation's longstanding national economic and foreign policies," upend federal regulations, bind the hands of the President, or control worldwide greenhouse gas policy. *See* Opp. 1–2. Rather, the State seeks relief only under established state law, and federal jurisdiction does not exist.

Defendants' arguments that federal common law provides a basis for removal jurisdiction should be flatly rejected. First, the federal common law claims on which Defendants rely have been displaced by the Clean Air Act ("CAA" or "the Act"), 42 U.S.C. § 7401 *et seq*. And by displacing the federal common law, the CAA left no room for the federal common law to "control" to the exclusion of state law. Quite the opposite—the Act emphasizes and preserves state involvement in the field. Second, no appellate authority supports Defendants' contention that the (displaced) federal common law "controls" all causes of action relating in any way to climate change, to the exclusion of any and all state law claims. Finally, Defendants' arguments that federal law "controls" the state law claims present at best an ordinary preemption defense that cannot and does not support removal jurisdiction.

The State's claims likewise do not "arise under" federal law under *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005). Defendants do not point to one essential element of any state law claim at issue that depends on the interpretation or application of federal law, or otherwise necessarily raises disputed and substantial federal issues. Instead, Defendants broadly suggest that the State's claims "implicate" foreign affairs and a hodge-

podge of federal regulations. That position misconstrues the State's Complaint—which can and must be resolved entirely under state law—and would not satisfy the four-part *Grable* test even if it were accurate. At most, Defendants' arguments again raise only preemption defenses that do not support removal jurisdiction and should instead be resolved by the state court on remand.

Nothing in the CAA completely preempts the State's claims, either. The State's constitutional, common law, and statutory claims against Defendants for their wrongful marketing and promotion of defective fossil fuel products have no connection to the regulatory framework governing source emissions, and thus are not "within the scope" of the CAA. Moreover, multiple courts have already rejected Defendants' argument that the CAA completely preempts all state law claims involving air pollution, and for good reason. Courts have recognized and held that the CAA expressly identifies the "primary role" states play in regulating air pollution, and affirmed Rhode Island's and other states' interests in addressing climate change. No court anywhere has found that the CAA has such extraordinary preemptive force that it completely preempts state law claims and converts them into federal ones.

Defendants' remaining bases for jurisdiction are without merit. The state law claims here do not arise out of operations on the Outer Continental Shelf or any federal enclave, and no federal officer directed Defendants to produce, market, and deceptively promote fossil fuels for profit. Defendants make no effort to contest the public purpose of the State's case, which brings it squarely outside the scope of bankruptcy jurisdiction. Finally, Defendants ignore extensive caselaw confirming that admiralty is not a sufficient basis for removal and fail to establish that the specialized nook of admiralty law is appropriate here. For all these reasons, remand is required.

## II. RELEVANT LEGAL STANDARDS[1]

When a plaintiff's state court complaint asserts only state law claims, the action "arises under" federal law for purposes of removal jurisdiction in only two circumstances: when the plaintiff's state law claims satisfy the four-part test articulated in *Grable*, 545 U.S. 308, or when

---

[1] General standards governing removal and remand are stated in the State's Motion at Part II.

the plaintiff's state law claims satisfy the "artful pleading" doctrine. The First Circuit and its district courts have consistently held that the artful pleading doctrine is, in turn, coextensive with the "complete preemption" doctrine, and thus applies only when the plaintiff's state law claims are completely preempted by a federal statute. The Defendants' Opposition identifies the *Grable* and artful pleading tests—but then attempts to apply the artful pleading doctrine outside the complete preemption context, which fails as a matter of law. For the reasons stated at length in the State's Motion and in Parts III.B and III.C *infra*, neither *Grable* nor complete preemption provide jurisdiction over this case.

The well-pleaded complaint rule "makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). One narrow exception to the well-pleaded complaint doctrine, "embodied in the artful pleading doctrine," provides federal question jurisdiction only when a putative state law claim is "completely preempted" by a federal statute:

> [T]he artful pleading doctrine allows a federal court to peer beneath the local-law veneer of a plaintiff's complaint in order to glean the true nature of the claims presented. . . . This jurisdiction-granting exception, known as complete preemption, comprises a narrow exception to the well-pleaded complaint rule.

*López-Muñoz v. Triple-S Salud, Inc.*, 754 F.3d 1, 5 (1st Cir. 2014); *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 471 (1998) ("The artful pleading doctrine allows removal where federal law completely preempts an asserted state-law claim."). Complete preemption occurs only in the rare instance where "the pre-emptive force of a *statute* is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim.'" *Caterpillar*, 482 U.S. at 393 (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987)) (emphasis added).

The Supreme Court has expressed "reluctan[ce] to find th[e] extraordinary pre-emptive power" required for complete preemption, *Metro. Life Ins. Co.*, 481 U.S. at 65, and has only recognized it with respect to three statutes—the National Bank Act, the Employee Retirement Income Security Act of 1974 ("ERISA"), and Section 301 of the Labor Management Relations

Act ("LMRA"). As discussed in Part IV.C of the State's Motion and Part III.C *infra*, no court has held that the CAA completely preempts state law.

The First Circuit has repeatedly stated that it is "skeptical of the applicability of the artful pleading doctrine outside of complete federal preemption of a state cause of action," and has consistently limited its use to that context. *Rossello-Gonzalez v. Calderon-Serra*, 398 F.3d 1, 11–12 (1st Cir. 2004); *see also Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 17 (1st Cir. 2018) ("complete preemption doctrine" is "sometimes referred to as the artful pleading doctrine"); *Negrón-Fuentes v. UPS Supply Chain Sols.*, 532 F.3d 1, 6 (1st Cir. 2008) ("The phrase 'complete preemption' is sometimes used to describe" artful pleading doctrine.); *Metheny v. Becker*, 352 F.3d 458, 460 (1st Cir. 2003) (observing "the artful pleading doctrine is called into play" only where Congress "completely preempted plaintiffs' claims").

District courts in this circuit have, in turn, routinely held that the artful pleading doctrine only affords federal question jurisdiction when a statute completely preempts a state law claim. *See, e.g.*, *Warner v. Atkinson Freight Lines Corp.*, 350 F. Supp. 2d 108, 115 (D. Me. 2004) (applying artful pleading doctrine where state law claims completely preempted by LMRA and ERISA); *Flores-Flores v. Horizon Lines of Puerto Rico, Inc.*, 875 F. Supp. 2d 90, 93 (D.P.R. 2012) (observing "[t]he necessary ground for the creation of the artful pleading doctrine was that the preemptive force of a federal statute was so powerful as to displace entirely any state cause of action" and finding claims completely preempted by ERISA); *Colon-Rodriguez v. Astra/Zeneca Pharm., LP*, 831 F. Supp. 2d 545, 549 (D.P.R. 2011) (applying " artful pleading" doctrine, "sometimes called 'complete preemption'"). Defendants' suggestion that the artful pleading doctrine can otherwise create jurisdiction finds no support in controlling law.

III. **ARGUMENT**

   A. **Federal Common Law Does Not Confer Federal Jurisdiction over Rhode Island's Purely State Law Claims.**

Federal common law cannot provide subject-matter jurisdiction over the State's claims for at least three reasons, all of which have already been addressed in the State's Motion. First, the federal common law of interstate air pollution on which Defendants rely was displaced by the

CAA and "no longer exists." *County of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934, 937 (N.D. Cal. 2018) ("*San Mateo*"). Second, even if it had not been displaced, no appellate court has held that federal common law "controls" claims like the State's. To the contrary, *American Electric Power Co. v. Connecticut*, 564 U.S. 410 (2011) ("*AEP*"), and *Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849 (9th Cir. 2012) ("*Kivalina*"), *cert. denied*, 133 S. Ct. 2390 (2013), both held only that federal common law had been displaced, and expressly declined to resolve whether any body of federal law "controlled" state law claims. *See* Mot. 12–15. Third, even if federal common law *did* "control," that would not mean Rhode Island's state law claims arise under federal law. Instead, that would at most provide ordinary defensive conflict or field preemption arguments that Defendants could raise on remand—it would not create federal question jurisdiction. At bottom, displaced federal common law does not and cannot create federal subject-matter jurisdiction over state law claims under any valid analysis.

1. ***AEP* and *Kivalina* Held that the Clean Air Act Displaced the Federal Common Law, and Expressly Reserved Ruling on State Law Claims.**

   a. *AEP* Held Only That Federal Common Law Is Displaced; Because It No Longer Exists, Federal Common Law Also Does Not "Control" Rhode Island's State Law Claims.

The Supreme Court clearly held in *AEP* that "the Clean Air Act and the EPA actions it authorizes displace *any* federal common law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired power plants." 564 U.S. at 423–24. It therefore expressly declined to entertain the "academic question whether, in the absence of the [Act], the plaintiffs could state a federal common law claim for curtailment of greenhouse gas emissions because of their contribution to global warming." *Id.* In turn, because "the Clean Air Act displaces federal common law, the availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect of the federal Act," and not whatever independent force the now-displaced common law may have once had. *Id.* at 429. That result is necessarily so because "when Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears," and normal rules of federal preemption apply.

*City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 314 (1981) ("*Milwaukee*"). The court in *San Mateo* thus rejected federal common law as a basis for jurisdiction, finding that the cases "should not have been removed to federal court on the basis of federal common law that no longer exists." *San Mateo*, 294 F. Supp. 3d at 937.

Defendants' arguments regarding *AEP* rip various phrases from their proper context and sew together an unrecognizable version of the case's holdings. Contrary to Defendants' assertions, *AEP* did not hold that "federal common law governs [all] public nuisance claim[s] for global-warming-related injuries." Opp. 14. Quite the opposite is true. The reading Defendants force upon *AEP* makes no sense, and ignores the context of the case. If, as Defendants contend, the Supreme Court intended to reach the breathtaking holdings that 1) *no* state law may apply to *any* "global warming claims," 2) "federal law" and a "federal rule of decision" are "required" no matter what is alleged in the pleadings, and 3) all such claims must be adjudicated in federal court, *see* Opp. 20, one would expect the Court to state those holdings unambiguously. But none of them are stated expressly or even implicitly in *AEP*. Abrogating the right of all fifty states and their courts, including Rhode Island, to bring or adjudicate any claims asserting "global-warming-related injuries," Opp. 14—without any direction from Congress—would present profound federalism problems, would make no sense in the context of a case holding that a federal statute *displaced* the very common law that Defendants purport controls, and would likewise make no sense given the Court's statement that "the availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect of the federal Act." *AEP*, 564 U.S. at 429.

The *San Mateo* court recognized as much when it rejected identical arguments: "Far from holding (as the defendants bravely assert) that state law claims relating to global warming are superseded by federal common law, the Supreme Court [in *AEP*] noted that the question of whether such state law claims survived would depend on whether they are preempted by the federal statute that had displaced federal common law (a question the Court did not resolve)." *San Mateo*, 294 F. Supp. 3d at 937. Defendants' interpretation of *AEP* should be rejected outright.

### b. *Kivalina* Also Held Only That Federal Common Law is Displaced.

The Ninth Circuit in *Kivalina* reached the same result as *AEP*, holding that the plaintiff's federal common law claims were displaced by the CAA and going no further. It did not, as Defendants contend, hold that the displaced federal common law "controls" any issue, nor even consider any question of jurisdiction over state law claims like the State's here.

Because the *Kivalina* plaintiff "s[ought] to invoke the federal common law of public nuisance," the court properly began its analysis "by addressing first the threshold questions of whether such a theory is viable under federal common law in the first instance and, if so, whether any legislative action has displaced it." *Kivalina*, 696 F.3d at 855. The court held that, in general, "federal common law can apply to transboundary pollution suits," but observed that "when federal statutes directly answer the federal question, federal common law does not provide a remedy because legislative action has displaced the common law." *Id.* at 855–856. The court then held that it need not determine whether the plaintiff's federal common law claims would have been cognizable in a vacuum, because "[t]he Supreme Court has already determined that Congress has directly addressed the issue of domestic greenhouse gas emissions from stationary sources and has therefore displaced *federal* common law." *Id.* at 856 (emphasis added) (*citing AEP*, 564 U.S. at 423–24). Defendants' Opposition mischaracterizes the court's recitation of the *history and general application* of federal common law, and its statement that federal common law "can apply" to certain pollution claims, as a broad holding that federal common law somehow replaces any and all state law claims. Opp. 12. That is simply wrong—no state law claims were even before the court—and it had no occasion to rule on their relationship to either federal common law or the CAA. There is no good-faith, contextual reading under which *AEP* or *Kivalina* can be understood to abrogate any and all state law causes of action for injuries related to climate change.

Other circuits have agreed with *Kivalina* that displacement of federal common law by the CAA does not convert claims pleaded under state law into federal causes of action. *See Bell v. Cheswick Generating Station*, 734 F.3d 188, 197 n.7 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 2696 (2014) (*AEP* "does nothing to alter our analysis," that state law claims were not preempted by

CAA, because displacement of federal common law is governed by different principles than preemption of state law, and *AEP* "explicitly left open the question of whether the Clean Air Act preempted state law"); *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 693 (6th Cir. 2015) ("There are fundamental differences . . . between displacement of federal common law by the [Clean Air] Act and preemption of state common law by the Act."). The CAA could only create federal jurisdiction over well-pleaded state law claims if it completely preempted those claims, and as explained in Part III.C *infra*, it does not.

Ignoring the clear holdings in *AEP* and *Kivalina*, Defendants argue that this Court has jurisdiction because "in the context of a particular claim involving climate change, a federal rule of decision is necessary to protect uniquely federal interests" and that there are a variety of "uniquely federal interests" such that the Court should craft a new federal rule of decision and apply that rule to obtain jurisdiction. Opp. 16. First, as explained in the State's Motion, Mot. 18–19, there is no uniquely federal interest in providing redress for in-State injuries suffered from defendants' past tortious over-promotion, over-marketing, and failures to warn, of their dangerous and defective products. *See, e.g.*, *Jackson v. Johns-Manville Sales Corp.*, 750 F.2d 1314, 1324 (5th Cir. 1985) (*en banc*) (state law, not federal common law, governed in cases against asbestos manufacturers); *In re Agent Orange Prod. Liab. Litig.*, 635 F.2d 987, 995 (2d Cir. 1980) (state law, not federal common law, governed class action tort case on behalf of millions of U.S. soldiers who had served in Vietnam against producers of Agent Orange, despite federal interest in the health of veterans). Nor is there a uniquely federal interest in addressing climate change generally. *See* Mot. 17–18; *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013); *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 339–40 (D. Vt. 2007). Moreover, because the federal common law "no longer exists," it neither "controls" the State's claims nor provides a basis for federal jurisdiction. *See San Mateo*, 294 F. Supp. 3d at 937.

Defendants' arguments that *AEP* and *Kivalina* do not "authorize" state law claims for any injuries related to climate change are baseless. Defendants first argue that "the decision that federal common law applies to a particular cause of action *necessarily* reflects a determination that state

law does *not* apply." Opp. 19. As the State has already explained at length, neither *AEP* nor *Kivalina* stands for the proposition that "federal common law applies" to the State's claims. More importantly, Defendants' reliance on the tautological statement in *Milwaukee* that "if federal common law exists, it is because state law cannot be used," ignores the immediately preceding clause: "If state law can be applied, there is no need for federal common law." 451 U.S. at 313 n.7. Because both *Kivalina* and *AEP* declined to determine whether "state law can be applied," there is no basis to infer that displaced federal common law "controls."

Second, Defendants' repeated out-of-context reliance on the Court's statement in *AEP* that "borrowing the law of a particular state would be inappropriate" remains inapposite. 564 U.S. at 422; Opp. 19. In describing the history and development of "specialized federal common law," the Court observed that "[a]bsent a demonstrated need for a federal rule of decision, the Court has taken the prudent course of adopting the readymade body of state law as the federal rule of decision until Congress strikes a different accommodation." *Id.* But where "*borrowing* the law of a particular State" and incorporating it as federal common law "would be inappropriate, the Court remains mindful that it does not have creative power akin to that vested in Congress." *Id.* In context, the Court's observation pertained to when the federal common law should incorporate state law rules of decision for choice of law purposes, and the limits on federal courts crafting federal law from whole cloth. That dicta cannot be read for the broad proposition Defendants advocate, that federal common law necessarily preempts and supplants *all* state law causes of action relating to climate change.[2]

As a final matter, this Court may not resurrect displaced federal common law tort claims and bootstrap its own jurisdiction onto them, especially when no federal law claims appear on the face of the State's Complaint. The Supreme Court has stated clearly that "when Congress addresses a question [that] previously governed by a decision rested on federal common law[,] the need for

---

[2] As already explained in the State's Motion, the Court observed that it would be inappropriate to "borro[w] the law of a particular State" because the plaintiffs represented eight different states and New York City. Thus, if federal common law *did* apply, it would be difficult if not impossible to determine which jurisdiction's law should be incorporated as the controlling federal rule. *See* Mot. 13 n.4.

such an unusual exercise of lawmaking by federal courts disappears." *Milwaukee*, 451 U.S. at 305. Such is the case here—*AEP* and *Kivalina* both squarely hold that "the Clean Air Act and the EPA actions it authorizes displace any federal common law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired power plants," *AEP*, 564 U.S. at 423–24, and as such, whatever policy basis may have once existed in theory to craft a body of federal common law for such abatement has also been displaced.

      c.   Defendants' Remaining Arguments Concerning *Ouellette* Implicate Only Non-Jurisdictional Ordinary Preemption.

Defendants' reliance on *International Paper Co. v. Ouellette*, 479 U.S. 481 (1987), and the source-state rule is a federal preemption argument that has no relevance to the jurisdictional issue before this Court. Defendants' themselves recognize: "The question in *Ouellette* was whether the [CAA] preempted a public nuisance claim brought by Vermont plaintiffs in Vermont court under Vermont law to abate a nuisance in New York." Opp. 20. No question of jurisdiction was before the Court in *Ouelette* nor any of the other cases Defendants cite interpreting it. As Defendants admit, the question remanded in *AEP* was whether the plaintiffs' state law claims "were *preempted* by the Clean Air Act." *Id.* Whether or not the State's claims here are preempted by the CAA under *Ouelette*'s source state rule—the State contends they are not—is a federal defense that the Rhode Island courts are competent to adjudicate on remand, and does not create jurisdiction. Defendants' exploration of preemption under *Ouelette* is irrelevant here: the Complaint should be remanded to state court based on the well-pleaded claims therein.

Finally, Defendants' attacks on the *San Mateo* decision simply rehash their other arguments that the State's claims are "preempted by the Clean Air Act," Opp. 22, which, despite their statements to the contrary, cannot serve as a basis for this Court's jurisdiction. *See infra* Part III.C; Mot. 32–39. Defendants state that "[t]he *San Mateo* court failed to recognize that the narrow category of state-law claims left open in *Ouellette* were inapposite, because the plaintiffs in *San Mateo*, like the State here, did not argue that the Clean Air Act authorizes state-law nuisance suits against out-of-state sources of pollution." Opp. 22. As the *San Mateo* court recognized, however,

whether the CAA "authorizes" claims like the State's here—that is, whether the CAA preempts the state law claims as pleaded—is irrelevant to the jurisdictional analysis and can and should be resolved by the state court on remand. "Simply put, th[is] cas[e] should not have been removed to federal court on the basis of federal common law that no longer exists." *San Mateo*, 294 F. Supp. 3d at 937 (citing *AEP*, 564 U.S. at 429).

### 2. Defendants' Arguments That Displaced Federal Common Law "Provides an Independent Basis for Federal-Question Jurisdiction" Contradicts All Controlling Appellate Authority.

When a complaint alleges only state law causes of action, those claims can arise under federal law in only one of two ways: by applying the elements of *Grable*, or by applying the complete preemption doctrine. *See* Part II, *supra*. The First Circuit has squarely and repeatedly held that "every putative federal question case must pay tribute to the well-pleaded complaint rule," and that "[t]o satisfy the rule, the plaintiff's well-pleaded complaint must exhibit, within its four corners, <u>either</u> an explicit federal cause of action <u>or</u> a state-law cause of action that contains an embedded question of federal law that is both substantial and disputed" as those terms are defined in *Grable*. *See Rhode Island Fishermen's All., Inc. v. Rhode Island Dep't Of Envtl. Mgmt.*, 585 F.3d 42, 48 (1st Cir. 2009). The limited exception to the well-pleaded complaint rule known as the artful pleading doctrine is co-extensive with the complete preemption doctrine. *See, e.g.*, *Lawless*, 894 F.3d at 17 (noting that the parties argued the removed complaint "raises a colorable claim under the complete preemption doctrine (sometimes referred to as the artful pleading doctrine)"). Both of those analytical paths are discussed in detail the State's Motion and herein, and both require remand. *See* Mot. 20–38; Parts III.B & III.C, *infra*.

Relying on the court's faulty reasoning in the *Oakland* cases, Defendants claim that ignoring both *Grable* and complete preemption is "entirely proper" because the court may simply "conclud[e] that the plaintiffs' claims, if they exis[t] at all, asser[t] a *federal cause of action*" under federal common law. Opp. 24. This argument violates the well-pleaded complaint rule, ignores its limited exceptions, and invites reversible error. Defendants' insistence that they "are not contending that Plaintiff's state-law nuisance claim addressing transboundary pollution *conflicts*

with federal law—the point is that the claims a*rise under* federal common law," Opp. 23, simply begs the question. The State's Rhode Island law claims can only "arise under" federal law within the meaning of 28 U.S.C. § 1331 if they satisfy *Grable*, or are completely preempted. Defendants' arguments to the contrary gravely misstate controlling law and must be rejected.[3]

Courts in this circuit have rejected identical invitations to "re-characterize [a plaintiff's state law] complaint as a federal common law action" when neither *Grable* nor complete preemption apply. *Enf't Enforcement Section of Massachusetts Sec. Div. of Office of Sec'y of Commonwealth v. Scottrade, Inc.*, No. CV 18-10508-NMG, 2018 WL 3946465, at *7 (D. Mass. Aug. 16, 2018). In that case, the defendant removed Massachusetts securities law claims to federal court, arguing that the claims "ar[ose] under and [were] governed by ERISA." *Id.* at *1–2. The court found that *Grable* was not satisfied, and that ERISA did not completely preempt the securities claims. *Id.* at *3–5. With those arguments defeated, the court observed, "[i]n a last gasp, defendant suggests that the issue in this case is of such central importance to ERISA that this Court should re-characterize the complaint as a federal common law action." *Id.* at *7. The court reasoned that First Circuit had admonished courts "to be 'careful not to allow federal common law to rewrite ERISA's carefully crafted statutory scheme,'" and apply common law "only if necessary to fill in interstitially or otherwise effectuate the statutory pattern enacted in large by Congress" such as "identifying the standard of judicial review of a plan administrator's decisions . . . or permitting a claim for restitution for funds misallocated from one ERISA plan to another." *Id.* (quoting *State St. Bank & Tr. Co. v. Denman Tire Corp.*, 240 F.3d 83, 89 (1st Cir. 2001)). Because the state law securities claims "b[ore] no resemblance to such limited exercises of common law

---

[3] The three out-of-circuit cases Defendants cite in support of their untethered view of "arising under" jurisdiction pre-date the 2005 *Grable* decision, and are incompatible with it. *See New SD, Inc. v. Rockwell Int'l Corp.*, 79 F.3d 953 (9th Cir. 1996); *Wayne v. DHL Worldwide Express*, 294 F.3d 1179, 1184 (9th Cir. 2002); *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 928–29 (5th Cir. 1997). In particular, multiple courts have directly questioned the continued validity of the Ninth Circuit's holding in *New SD*, because its reasoning that "[w]hen federal law applies, … it follows that the question arises under federal law" is inconsistent with the Supreme Court's subsequent holding in *Grable*. *See Babcock Servs., Inc. v. CH2M Hill Plateau Remediation Co.*, No. 13-CV-5093-TOR, 2013 WL 5724465, at *4 (E.D. Wash. Oct. 21, 2013) (noting that *New SD*'s premise is "no longer sound" under *Grable*); *Raytheon Co. v. Alliant Techsystems, Inc.*, No. CIV 13-1048-TUC-CKJ, 2014 WL 29106, at *4 (D. Ariz. Jan. 3, 2014) (same).

authority," the court declined to recharacterize them as newly crafted federal common law claims. *Id.*

Defendants' arguments that the Rhode Island's state law claims here "*arise under* federal common law," Opp. 23, ignore entirely on-point, controlling authority spelling out the analysis a District Court must apply: namely, *Grable* and the complete preemption doctrine, which are discussed in the State's Motion and in Parts III.B and III.C *infra*. Just as in *Scottrade*, the extremely limited instances when federal courts may craft common law are not present here, and the Court has no alternative, free-floating, unguided authority to determine that a state law cause of action simply *is* federal in derogation of the pleadings.

### 3. Defendants' Argument That the Clean Air Act's Displacement of Federal Common Law Made State Law Claims Unavailable Is Plainly an Ordinary Defensive Preemption Argument.

Finally, Defendants' argument that the State's "nuisance claim arises under federal common law, whether or not the [CAA] has displaced any federal common law remedy," Opp. 24–26, is antithetical to the law, and merely conflates and repackages ordinary preemption and complete preemption arguments. Exactly the opposite is true: "once federal common law is displaced by a federal statute, there is no longer a possibility that state law claims could be superseded by the previously-operative federal common law." *San Mateo*, 294 F. Supp. 3d at 937. Defendants' contention that "the enactment of a comprehensive federal statutory framework [the CAA] in an area previously occupied by federal common law . . . underscores the federal nature of the field," Opp. 25, even assuming *arguendo* that it were correct, could therefore only be relevant to state law claims in one of two ways: ordinary or complete preemption of those state claims by the CAA itself, since the federal common law no longer exists. Ordinary preemption is not a basis for jurisdiction, and complete preemption fails.[4]

---

[4] Complete preemption cannot be premised on federal common law, moreover, because it only arises in the narrow circumstance where "the pre-emptive force of a *statute* is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim.'" *Caterpillar*, 482 U.S. at 393 (quoting *Metro. Life Ins. Co.*, 481 U.S. at 65) (emphasis added); *see also Ry. Labor Executives Ass'n v.*

Defendants' argument that the CAA "so comprehensively addresses the subject" that it would be "inappropriate for state law to control" because of the "federal nature of the field," Opp. 24–25, plainly describes ordinary field preemption. Field preemption is a federal defense—it cannot serve a basis for federal question jurisdiction—and should be adjudicated by the state court on remand. *See, e.g.*, *Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 273, 276 & n.7 (2d Cir. 2005) (observing that "field preemption and the doctrine of complete preemption both rest on the breadth, in some crude sense, of a federal statute's preemptive force" but noting that the two analyses are "better considered distinct" because complete preemption is a jurisdictional analysis and field preemption is not, and holding that Railway Labor Act "does not completely preempt state-law claims that come within its scope"). If, on the other hand, the CAA displaced federal common law *and* abrogated state law claims and converted them to federal ones, that is plainly an argument for complete preemption. For the reasons discussed below and in the State's Motion, the CAA did not completely preempt state law, and there is no "unique federal interest" in climate change harms within Rhode Island. *See* Mot. Parts IV.A.4 & IV.C. Nothing in *AEP*, *Kivalina*, any other decision of any court, supports the unprecedented and free-wheeling jurisdictional grant Defendants advocate.

Plowing onward, Defendants contend that no matter what the CAA did or did not do with respect to federal common law, *AEP* and *Kivalina* demand a "two-step analysis" that first asks the "jurisdictional" question whether "federal law governs" a state law claim, which then converts the well-pleaded state law causes of action into federal ones. Opp. 26. That position profoundly misrepresents and misquotes both opinions. First, in both *Kivalina* and *AEP*, the courts discussed whether the plaintiffs' claims could have been "viable under federal common law," *AEP*, 564 U.S. at 422; *Kivalina*, 696 F.3d at 855, *because the plaintiffs expressly brought federal common law causes of action in federal district court*. Defendants' contention that the "first step" in their

---

*Pittsburgh & Lake Erie R. Co.*, 858 F.2d 936, 942 (3d Cir. 1988) (Complete preemption requires "a clear indication of a *Congressional* intention to permit removal despite the plaintiff's exclusive reliance on state law.") (reversing dismissal of plaintiff's claims and ordering remand to state court, holding that Railway Labor Act and Interstate Commerce Act did not completely preempt state law claims).

purported analysis is "jurisdictional" makes no sense because no jurisdictional question was before the court in either case. Second, Defendants' contention that *AEP* instructed a "two-step analysis" that asks "first whether . . . federal law governs" also makes no sense given the Court's declining to answer the "academic question whether, in the absence of [the CAA], the plaintiffs could state a federal common law claim," and its statement that "the availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect of the federal Act." *AEP*, 564 U.S. at 422–23, 429. Nothing akin to Defendants' interpretations appears anywhere in either opinion.

The only First Circuit case Defendants cite for this proposition is wholly inapposite. In *Lawless v. Steward Health Care Sys., LLC*, the court found *sua sponte* on a post-judgment appeal that removal jurisdiction existed because at the time of removal the amended complaint contained a cause of action for which there was a "colorable claim of complete preemption under the Labor Management Relations Act," and "[a] federal question may exist *under the complete preemption doctrine*, even if that question is absent from the four corners of the operative complaint." 894 F.3d at 15–17 & n.2 (emphasis added). The case says nothing about federal common law, let alone the jurisdictional consequences of the displacement of federal common law by statute, and provides no support for Defendants' position.

**B. Rhode Island's State Law Claims Do Not Support *Grable* Jurisdiction.**

As explained in the State's Motion, state law claims only fall into the "'special and small' category of cases in which arising under jurisdiction still lies," *Gunn v. Minton*, 568 U.S. 251, 258 (2013), when they "really and substantially involv[e] a dispute or controversy respecting the validity, construction or effect of [federal] law." *Grable*, 545 U.S. at 313. That is so only when, on the face of the complaint, a federal issue is: "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. Defendants repeatedly assert that the State's claims are removable because they "implicate," and "impact" federal interests. Opp. 28, 31, 37, 39. But those assertions evade the actual test for "arising under" jurisdiction under *Grable*

and its progeny. *Grable* did not overturn the well-pleaded complaint rule, and a federal defense alone cannot bring state law claims into federal court. *R.I. Fishermen's Alliance.*, 585 F.3d at 48.

### 1. No Question of Federal Law Is a Necessary Element of Any Claim Here.

These claims do not "necessarily raise" any issue of federal law, because no "question of federal law is a *necessary element*" of any of them. *See Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 13 (1983) (emphasis added). Unlike *R.I. Fishermen's Alliance*—where the court affirmed federal jurisdiction because the statute creating the plaintiff's claims "expressly reference[d] federal law," 585 F.3d at 50—Defendants here merely note federal issues that may be "implicated." But "[f]ederal jurisdiction cannot be conjured up by a passing mention of some federal subject." *Id.*

The only court that has analyzed *Grable* jurisdiction in a state-law tort case for injuries related to climate change rejected it, emphasizing that "the defendants have not pointed to a specific issue of federal law that must necessarily be resolved to adjudicate the state law claims" and that "defendants mostly gesture toward federal law and federal concerns in a generalized way," *See San Mateo*, 294 F. Supp. 3d at 938. The same result must follow here: none of the federal issues Defendants identify are necessary to the State's causes of action.

a. Defendants' Invocation of Foreign Affairs Misconstrues the State's Claims, and Does Not Supply Any Basis for Grable Removal.

As explained in the State's Motion, Mot. 29–31, "[u]nder the foreign affairs doctrine, state laws that intrude on th[e] exclusively federal power [to administer foreign affairs] are preempted." *Gingery v. City of Glendale*, 831 F.3d 1222, 1228 (9th Cir. 2016). The State here seeks monetary and equitable relief for its injuries from Defendants' production and wrongful promotion of defective products. This relief in no way intrudes on the federal government's foreign policy and diplomatic powers. The argument that the State's claims will supposedly hamstring the President's ability to negotiate with foreign states regarding climate change misrepresents the Complaint,

mischaracterizes federal climate and energy policies as excluding state action, and denies the well-accepted role of states combatting climate change and ensuring energy security.[5]

Even more, Defendants misapply the foreign relations doctrine altogether. Contrary to Defendants' arguments, the State's causes of action have no intended effect on foreign affairs and do not "necessarily raise" foreign affairs under *Grable*. *Provincial Government of Marinduque v. Placer Dome, Inc.* is analogous and instructive. 582 F.3d 1083 (9th Cir. 2009); *see also* Mot. 30. There, a Philippine province sued an American company in Nevada state court, alleging that the company caused environmental harm to the Province. *Id.* at 1085. The Province alleged that the Philippine president, "in exchange for a personal stake in the mining operations, eased various environmental protections" to benefit the defendant. *Id.* The defendant removed the case, arguing the complaint "tender[ed] questions of international law and foreign relations," and that the Province's claims were barred by the act of state doctrine, which requires deference to acts of foreign governments. *Id.* at 1085–86. Ordering remand to state court, the Ninth Circuit held "that the act of state doctrine is implicated here only defensively and the complaint does not 'necessarily raise a stated federal issue, actually disputed and substantial.'" *Id.* at 1090–91. Although the complaint was "sprinkled with references to the Philippine government, Philippine law, and the

---

[5] Defendants cite President Obama's Climate Action Plan to argue that climate change policy is exclusively federal because it is a matter of foreign policy. Opp. 29. But that Plan acknowledges states' concurrent role in combatting climate change. Lipshutz Decl., Ex. 11 ("*Building on efforts underway in states and communities across the country*, the President's plan cuts carbon pollution that causes climate change...") (emphasis added). None of the Presidential speeches cited by Defendants indicates climate change or energy policy are *solely* the federal government's province. *See id.* Exs. 1-10. To the contrary, those speeches emphasized states' roles in tackling these issues. *See e.g.*, *id*. Ex. 3. ("I will also ask every State to pass laws protecting Americans from arbitrary cutoffs of heat for their homes. . . I will set targets for our 50 States to reduce gasoline consumption and ask each State to meet its target") (Jimmy Carter); *Id.* Ex. 9 ("But going forward, we're going to continue to work . . . with states, to ensure the high-quality, fuel-efficient cars and trucks of tomorrow are built right here in the United States of America.") (Barack Obama). Far from impeding foreign policy, state efforts to combat climate change are aligned with decades of domestic energy policy, which has promoted decreased reliance on foreign oil imports and fossil fuels through energy conservation and efficiency and expanding clean energy sources. *See id.* Ex. 11 (introducing rules to "move our economy toward American-made clean energy sources."); *id.* Ex. 8 ("It's in our vital interest to diversify America's energy supply" through increased use of "solar and wind energy, and clean, safe nuclear power.") (George W. Bush); *see also id.* Exs. 3-4 & 11 (emphasizing energy conservation and efficiency).

government's complicity in the claimed damage," "a general invocation of international law or foreign relations [does not] mean that an act of state is an essential element of a claim." *Id.* at 1091; *see also Patrickson v. Dole Food Co.*, 251 F.3d 795, 804 (9th Cir. 2001), *aff'd in part, cert. dismissed in part,* 538 U.S. 468 (2003) ("If federal courts are so much better suited than state courts for handling cases that might raise foreign policy concerns, Congress will surely pass a statute giving us that jurisdiction."). This analysis must prevail here. Defendants invoke the foreign relations doctrine as a defense, and no essential element of any of the State's claims depends on its application. Foreign affairs are not "necessarily raised" in this case within *Grable's* meaning.

Even if their caricature of the Complaint were accurate, the few cases Defendants cite do not substitute the foreign affairs doctrine as a predicate for a "federal issue" under *Grable*. *See San Mateo*, 294 F. Supp. 3d at 938 ("The mere potential for foreign policy implications . . . does not raise the kind of actually disputed, substantial issue necessary for *Grable* jurisdiction."). When raised by a defendant and not on the face of the complaint, the doctrine at most serves as an ordinary preemption defense. Unsurprisingly, none of Defendants' cited cases involved *Grable* or any question of removal. All were initiated in federal court under expressly federal law theories, and in each the *plaintiff* expressly raised the foreign affairs doctrine in its complaint, seeking to invalidate state legislation under the Supremacy Clause. *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), and *American Insurance Association v. Garamendi*, 539 U.S. 396, 412–14 (2003), did not address the threshold "necessary element" question presented here. To the contrary, each involved a federal constitutional challenge, brought in federal court, to a state's explicit attempts to legislate in foreign affairs, and no state law claims were before the Court.[6]

---

[6] In *Crosby*, 530 U.S. 363, a trade association sued in federal court to enjoin enforcement of Massachusetts legislation that penalized companies doing business in Burma (Myanmar). The Court found the legislation was preempted by federal statutes imposing sanctions on Burma and by executive orders implementing those statutes. *Id.* at 386–88. The claims were expressly framed as federal constitutional challenges to the Massachusetts legislation, and no question of jurisdiction—let alone removal jurisdiction—was raised or adjudicated. Similarly, in *Garamendi*, 539 U.S. at 412–14 (2003), the plaintiffs sued in federal court to enjoin enforcement of a California statute directed at recovering insurance assets seized from Holocaust victims, arguing that the statute was preempted by executive agreements between the United States and German, Austria, and France under multiple Presidents, addressing recovery of the very same assets. The

b. <u>The State's Claims Do Not "Require Federal-Law-Based" Cost–Benefit Balancing.</u>

Defendants doggedly insist that federal rules covering agencies and private actors inject federal issues into the State's case, but none of their citations demonstrates that a "question of federal law is a necessary element of one of the well-pleaded state claims." *Franchise Tax Bd. of State of Cal.*, 463 U.S. at 13. Even assuming Defendants were correct that "[f]ederal law would necessarily govern the cost-benefit analysis required by Plaintiff's nuisance claims," Opp. 34—a position the State strongly rejects, *see, e.g.*, Mot. 22–24—that contention at most presents another ordinary conflict preemption defense to be argued in state court. This is so even if the "weighing were to implicate the defendants' dual obligations under federal and state law." *San Mateo*, 294 F. Supp. 3d at 938; *see also* Mot. 23–24. Defendants' semantic manipulations and laundry list of regulations mirroring Rhode Island tort duties, Opp. 31–35, do not change that the State's right to relief and every element of its claims do not depend on federal law. *See* Mot. 4, 21–22 (listing substantive Rhode Island law bases for elements of the State's claims).

The few cases Defendants cite are readily distinguished, because each depended on federal law to prove an essential element of a state law claim. *Bd. of Commissioners of Se. Louisiana Flood Prot. Auth.-E. v. Tennessee Gas Pipeline Co., L.L.C.*, 850 F.3d 714, 722–24 (5th Cir. 2017) ("*Tenn. Gas*"), involved negligence and nuisance claims nominally under Louisiana law that nonetheless "dr[ew] on federal law as the exclusive basis for holding Defendants liable for some of their actions," because Louisiana law did not create the duties the plaintiffs sought to enforce. The court found removal proper because the claims "cannot be resolved without a determination whether multiple federal statutes create a duty of care that *does not otherwise exist* under state law," and federal law therefore formed an essential element. *Id.* at 723 (emphasis added). Here, Rhode Island law recognizes causes of action to address a defendant that knowingly produces and promotes a product for a use that presents a hazard to the environment and public health. *See* Mot.

Court found the challenged California statute conflicted with the President's conduct of foreign affairs and was therefore preempted. *Id.* at 429.

4, 21–22. Federal law is not "required" here to establish a basis for liability that "does not otherwise exist under state law." *See Tenn. Gas*, 850 F.3d at 723; Mot. 24–25.

In contrast, cases in which federal statutes or regulations are not necessary elements of a plaintiff's affirmative claims do not satisfy *Grable*. For instance, the First Circuit recently held that *Grable* jurisdiction was improper for a state law breach of contract claim involving a contract stemming from the National Historic Preservation Act process but that did not impose a federal duty or require the finder of fact to interpret federal law. *Narragansett Indian Tribe v. R.I. Dept. of Transp.*, ___ F.3d ___, 2018 WL 4140270, *4 (1st Cir. Aug. 30, 2018) ("[T]he mere fact that a claim or defense requires an explanation of a federal statutory scheme as background does not mean that a complaint 'necessarily raise[s] a stated federal issue.'" (citing *Grable*, 545 U.S. at 314)). The *San Mateo* court recognized the slippery slope of drawing all state law claims touching upon federal standards into federal court: "On the defendants' theory, many (if not all) state tort claims that involve the balancing of interest and are brought against federally regulated entities would be removable. *Grable* does not sweep so broadly." 294 F. Supp. 3d at 938. For the reasons stated at length in the State's Motion, *see* Mot. 22–24, the regulatory balancing Defendants invoke is different in kind from any balancing required by traditional state tort law. Regardless, the statutes and regulations Defendants cite are not necessary elements of the State's claims, and do not establish "arising under" jurisdiction.[7]

---

[7] Courts have rejected such arguments in numerous regulatory contexts. *Ware v. N. Cent. Indus., Inc.*, No. 6:17-CV-01287-MC, 2017 WL 5569258, at *4 (D. Or. Nov. 20, 2017) (remanding state law negligence and product liability claim against fireworks manufacturer, "despite the fact that warnings for fireworks are proscribed by federal law," because complaint did not challenge adequacy of federally mandated warnings, and "the dispute here is whether the warnings were appropriate considering [defendant]'s knowledge of the defect"); *In re Roundup Prod. Liab. Litig.*, No. 16-MD-02741-VC, 2017 WL 3129098 (N.D. Cal. July 5, 2017) (even where federal law defined state-law obligations regarding herbicides, "[i]f that alone sufficed for federal jurisdiction, routine applications of the Supremacy Clause could be grounds for removal," which is "not what *Grable* stands for."); *McCarty v. Precision Airmotive Corp.*, No. 806CV1391T26TBM, 2006 WL 2644921, at *1 (M.D. Fla. Sept. 14, 2006) ("FAA rules and regulations may be relevant to defining the duty of care in a negligence case or the standard in a products liability case, [but do] not elevate a typical state-law tort claim to one requiring resolution in a federal forum.").

c. The State's Claims Are Not Collateral Attacks on Federal Regulation.

This case does not seek to attack, modify, or evade federal regulations or law any more than it seeks to alter U.S. foreign relations; the State only seeks to protect its citizens and resources from climate change harms using existing state laws, and remedies. Defendants' cited cases all involved facial attacks on federal regulation, which are not present here. In *McKay v. City & Cty. of San Francisco*, No. 16-CV-03561 NC, 2016 WL 7425927, at *1–2 (N.D. Cal. Dec. 23, 2016), residents brought state law nuisance claims in state court to enjoin use of flightpaths approved by the Federal Aviation Administration ("FAA") alleging that the flightpaths created unreasonable noise. *Id.* at *2. The court denied remand not because the case presented issues within the FAA's purview, but instead because the injunctive relief sought was "tantamount to asking the Court to second guess the validity of the FAA's decision." *Id.* at *4. Because the complaint expressly asked the court to invalidate federal regulation, a substantial and disputed federal issue was necessarily present on the face of the complaint. *Id.* at *4–5. The State does not seek an injunction here that would invalidate or modify a federal agency's regulatory decision.

*Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 559 F.3d 772 (8th Cir. 2009), is equally inapposite. The plaintiff filed an action in state court alleging that a stock borrowing program created and operated by the defendants facilitated a short-selling scheme that drove down the price of the plaintiff's stock and put it out of business. *Id.* at 775. The court affirmed an order denying remand because the complaint expressly alleged that the stock borrowing program—which had been approved and regulated by the Securities and Exchange Commission pursuant to federal statute—hindered competition "by its mere existence." *Id.* at 779. The court affirmed removal because those allegations necessarily challenged "actions taken by the Commission in approving the…Program and the rules governing it," as the central basis for assigning liability. *Id.* The State's claims here do not challenge any federal agency decisions, explicitly or implicitly, and

the State's Complaint in no way mirrors the key language in the *Pet Quarters* complaint.[8]

### d. The Claims Here Do Not "Implicate" Federal Duties to Disclose.

The State has no cause of action for "fraud on the EPA" or any similar claim requiring proof that a federal regulator was defrauded—nor any fraud cause of action whatsoever. Defendants nevertheless argue that the State's claims "implicate duties to disclose imposed by federal law," and attempt to graft a fraud claim that does not exist onto the Complaint. Opp. 39, 40. But Defendants' failure to disclose known harms to both regulators and the public is merely *relevant evidence* to show that they violated Rhode Island tort duties, for example to show their knowledge that their products were defective. It does not follow that federal disclosure duties are essential elements of any of the State's claims under *Grable*. *See In re Roundup Prods. Liab. Litig.*, 2017 WL 3129098, at *1 ("To be sure, evidence that Monsanto influenced the EPA may be indirectly relevant to the carcinogenicity inquiry, as collusion could undermine the value of the EPA's scientific conclusions. . . . But an issue is not 'necessary' to resolve for the purposes of federal-question jurisdiction simply because it has relevance.").[9]

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001), and other cases Defendants cite involving express "fraud on the government" claims are inapposite. In *Buckman*, the plaintiffs brought a state law claim for "fraud-on-the-FDA," for alleged misrepresentations resulting in FDA's approval of dangerous medical devices. *Id.* at 346–47. The Court held that preemption barred their state law fraud-on-the-FDA claim because the "federal statutory scheme amply

---

[8] Defendants' citation to *Bennett v. Sw. Airlines Co.*, 484 F.3d 907, 910 (7th Cir. 2007), fares no better. The court there observed that federal jurisdiction was proper in *Grable* because "the state proceeding amounted to a collateral attack on a federal agency's action," and the relief sought required the federal government to reimburse parties affected by the action. The *Bennett* plaintiff, by contrast, asserted traditional state law tort claims against an airline arising out of a crash, and the Seventh Circuit had already "held many times that claims related to air transport may be litigated in state court," notwithstanding federal regulation of the industry. *See id.* at 912. The court found no *Grable* jurisdiction, and ordered remand to state court. *Id.*

[9] *See also Organic Consumers Ass'n v. Gen. Mills, Inc.*, 235 F. Supp. 3d 226, 232 (D.D.C. 2017) (remanding to state court case concerning improper labeling of granola bars containing herbicide where federal law did not require disclosure of herbicide's presence, because "[a]lthough the complaint includes these allegations, plaintiffs' legal claim is that it is the undisclosed presence of glyphosate *in conjunction with* labels or advertisements of the products as 'natural' and 'healthy' that violates [District of Columbia law]" and "[t]hat claim does not require the application of existing federal disclosure regulations" (emphasis added)).

empowers the FDA to punish and deter fraud" against it. *Id.* at 347–48, 353. The case did not consider any question of removability or jurisdiction, and the Court's holding reinforces the conclusion that any federal duties in this case may be raised as part of a preemption defense on remand, because they are not elements of the State's state law causes of action here.

*Bader Farms, Inc. v. Monsanto Co.*, No. 1:16-CV-299 SNLJ, 2017 WL 633815 (E.D. Mo. Feb. 16, 2017), is likewise distinguishable. There, the plaintiff brought a fraudulent concealment claim that turned on the defendants' violation of a duty established under federal law. The plaintiff alleged that the defendants' misrepresentations to the Animal and Plant Health Inspection Service ("APHIS") about a genetically modified seed led to widespread illegal use of an unapproved herbicide on crops grown from those modified seeds. *Id*. at *1–2. The court determined that the fraud claim turned on the defendant's duty under the Federal Plant Protection Act to inform APHIS that releasing the seed for use could lead to illegal use of the herbicide. *Id*. at *3. The court found that because the fraudulent concealment claim expressly relied on a federal law duty to inform a federal agency, those federal duties were necessary elements of the plaintiff's claim, and *Grable* removal was proper. *Id.* Because there is no fraud claim in this case, and particularly no claim for fraud against a federal agency, no duty to disclose to any federal agency is necessarily raised.

Finally, *Tennnessee Gas* has no application here because, as discussed above, the state law tort claims there could not be resolved without determining whether "multiple federal statutes create[d] a duty of care that d[id] not otherwise exist under state law." Opp. 40 (quoting *Tenn. Gas*, 850 F.3d at 723). The specific duties the plaintiffs alleged existed, if at all, under the federal Clean Water Act and Rivers & Harbors Act, and were not independently recognized under Louisiana tort law; therefore, the complaint alleged a federal question on its face. *Tenn. Gas*, 850 F.3d at 722. For all the reasons discussed above, Rhode Island law imposes independent duties on Defendants, and the Complaint does not depend on any federal law duties.

**2. Federal Questions Are Not Disputed in the Complaint, and Would Not Meet *Grable*'s Substantiality Requirement If They Were.**

a. There Are No Disputed Federal Questions.

Because the Complaint raises no federal questions, there are no *disputed* federal questions. *Cf. Shanks v. Dressel*, 540 F.3d 1082, 1093 (9th Cir. 2008) (no *Grable* jurisdiction where plaintiff alleged defendant city violated its own municipal code with respect to building permit at federally registered historic place, but claim turned on compliance with municipal code only, and building's listing as federal historic place was "not controverted"). Defendants' generalized insistence that "Plaintiff's entire pleading" seeks to subvert foreign policy, national security, and virtually all environmental regulation, Opp. 41, does not make it so.

b. No Substantial Federal Question Is Raised.

None of the three non-exclusive factors the Supreme Court has identified to determine the *Grable* "substantiality" element is present here, *see* Mot. 26–27, and Defendants ignore them entirely in their Opposition brief.[10]

First, Defendants have not shown that the State's claims turn on pure questions of federal law, despite characterizing numerous federal issues as "implicated." Indeed, all of the State's causes of action depend on fact-bound questions under Rhode Island law. Second, Defendants have not shown that decisions here will control in other cases, but merely speculate ominously that the State's claims will upend huge swaths of federal law. The State's claims do not seek to modify any federal energy or regulatory scheme, and the remedies sought will not control outside the State's jurisdiction. Third, the federal government is not a party to this case.

There is no blanket exception to *Grable's* substantiality requirement for cases that may bear on certain federal concerns. Defendants point menacingly at broad federal policy considerations, namely foreign policy and national security, and pronounce that these cases will

---

[10] The factors are (1) whether the case involves pure questions of law, (2) whether rulings in the case will control in many other cases, and (3) whether the federal government has a strong interest in litigating the claims in a federal forum. *See MDS (Canada) Inc. v. Rad Source Techs., Inc.*, 720 F.3d 833, 842 (11th Cir. 2013) (citations omitted).

impact "the intersection of federal energy and environmental regulations," to suggest that federal issues are *per se* substantial. Opp. 41. But none of their citations stand for the proposition that cases "implicating" pollution, foreign affairs, or energy are automatically removable under *Grable*.

Rather, their cases are inapposite. The court in *In re National Security Agency Telecommunications Records Litigation*, 483 F. Supp. 2d 934 (N.D. Cal. 2007), held that the state secrets privilege "require[d] dismissal if national security concerns prevent plaintiffs from proving [their] *prima facie* elements" and observed that the federal government had already stated its intention to assert the privilege. *Id.* at 942. Under those unique circumstances, removal was proper. *Id.* at 943. Defendants here have not asserted the state secrets doctrine applies. *Grynberg Production Corp. v. British Gas, p.l.c.*, 817 F. Supp. 1338 (E.D. Tex. 1993), also rested on unique facts. There, the court found the complaint "necessarily" alleged "issues of federal international relations law" by seeking specific performance of a mineral rights contract in Kazakhstan. *Id.* at 1358–59. The facts here are worlds apart from those cases. Defendants' mere incantation of foreign relations, national security, and federal regulations does confer federal jurisdiction.

### c. Federal Jurisdiction Here Would Upset Principles of Federalism.

Under the final *Grable* element, the balance struck by Congress favors state court jurisdiction. As they do with all other elements of the *Grable* analysis, Defendants wholly misrepresent the substance of the Complaint and ignore the applicable legal standards. Opp. 42. But resolving doubts in favor of remand, as the Court must, these arguments fail.

The Supreme Court has instructed that "the combination of no federal cause of action and no preemption of state remedies" indicates that state courts may take jurisdiction over those claims. *Grable*, 545 U.S. at 318. Here, there is no federal remedy for the tortious conduct alleged in the Complaint, no federal cause of action for the damages and abatement the State seeks, and the state law claims are not preempted. Moreover, States have an obvious interest in responding to climate change. *See* Mot. 17–18 (citing Rhode Island and other state laws addressing climate change, as well as case law recognizing those legitimate interests). And even the CAA (which this case is not premised upon) emphasizes states' "primary" role in protecting air quality (42 U.S.C. §

7401(a)(3)), and explicitly saved state law private rights of action for remedies unavailable under the CAA's citizen suit provision. 42 U.S.C. §§ 7416, 7604(e). Here, the State is protecting its citizens by exercising rights unencumbered and untouched by Congress. *See, e.g.*, *Nat'l Audubon Soc. v. Dep't of Water*, 869 F.2d 1196, 1203 (9th Cir. 1988) ("the primary responsibility for maintaining the air quality rests on the states"); *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation,* 725 F.3d 65 (2d Cir. 2013) at 96 ("[T]he presumption that Congress did not intend [under the CAA] to preempt state law tort verdicts is particularly strong.").[11]

In sum, the State's remedies are limited in scope. The State seeks only damages and abatement to protect its infrastructure, natural resources, and citizens, and only within its geographic boundaries. The State seeks no injunctive relief, let alone relief that would bind the conduct of other state or federal officers. The State does not seek to regulate conduct across the globe, and would not have the authority to do so if it tried. There is no basis to conclude that the balance struck by Congress favors federal jurisdiction.

### C.  No Federal Statute Completely Preempts the Complaint's State Law Claims.[12]

The CAA cannot completely preempt the State's claims for the simple reason that congressional intent was to preserve the role of the States in controlling air pollution, as evidenced

---

[11] Defendants again cite inapposite cases. *Kurns v. R.R. Friction Prod. Corp.*, 565 U.S. 625, 637 (2012), did not analyze *Grable*, and held that the state common law tort claims were substantively preempted by the field-preemptive force of the federal Locomotive Inspection Act, which does not preserve state law tort claims. *Massachusetts v. E.P.A.*, 549 U.S. 497, 505 (2007), also did not involve a *Grable* analysis, and involved a direct challenge to EPA's conduct, asking the court expressly to determine "whether EPA has the statutory authority to regulate greenhouse gas emissions from new motor vehicles; and if so, whether its stated reasons for refusing to do so are consistent with the statute." Finally, *McKay*, 2016 WL 7425927, at *4, involved a challenge to a specific FAA order changing the flightpath of commercial planes over plaintiffs' houses, and thus a "collateral challenge to the final decision of the FAA" approving the flight plan, which was properly heard in federal court. These cases are not analogous to the State's claims here.

[12] Defendants' continued argument for application of complete preemption under the judicially created foreign affairs doctrine is inconsistent with the fundamental operation of the complete preemption doctrine, which requires a federal *statute* to convey congressional intent to preempt. *See supra* Part III.A.3, n. 4. As in their Notice of Removal, Defendants continue to rely on wholly irrelevant cases that do not even address the jurisdictional doctrine of complete preemption, but instead considered the foreign affairs doctrine on motions to dismiss. *See* Opp. 43–44 (citing *Garamendi*, 539 U.S. at 418, *People of State of California v. Gen. Motors Corp.*, No. C06-05755 MJJ, 2007 WL 2726871, at *14 (N.D. Cal. Sept. 17, 2007), *City of Oakland v. BP P.L.C.*, No. C 17-06011 WHA, 2018 WL 3109726, *7 (N.D. Ca. June 25, 2018), and *New York v. B.P. P.L.C.*, __ F.3d__, 2018 WL 3475470, *6 (S.D.N.Y. July 19, 2018).

by the inclusion of congressional findings and two savings clauses in the Act. *See* Mot. 35–36; *see also San Mateo,* 294 F. Supp. 3d at 938 (the savings clauses "suggest that Congress did not intend the federal causes of action under [the Act] 'to be exclusive'"). Defendants mischaracterize the State's claims and ignore clear congressional intent not to preempt state laws. Defendants' argument boils down to another ordinary preemption defense, which—again—cannot confer federal jurisdiction.

### 1. Complete Preemption Does Not Apply Because the State's Claims Are Outside the Scope of the Clean Air Act.

Despite Defendants' attempt to recast the nature and purpose of the State's claims, they do not fall "within the scope" of the CAA, as they must for complete preemption to apply. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004). A claim is only "within the scope" of a federal statute if (1) the plaintiff could have brought its claim under that federal statute, and (2) there is "no other independent legal duty that is implicated by a defendant's actions." *Id.*

First, the State's claims could not have been brought under the CAA. As Defendants acknowledge, emissions limits and permitting schemes are "the heart" of the Act. *See* Opp. 45. Consistent with this focus, the Act provides a right of action for violations of emissions standards or violations of an EPA order. 42 U.S.C. § 7607(e). Defendants' complete preemption argument rests on the false premise that this lawsuit is a backdoor attempt "to impose nationwide and even international emission standards." Opp. 48. However, the State's claims rest on Defendants' wrongful marketing and promotion of fossil fuels products, the defective nature of those products, and Defendants' failure to warn of the effects of those defective products. Compl. ¶¶ 225–315. The CAA provides no right of action for wrongful promotion of defective products; does not regulate the marketing, promotion, or sale of defective fossil fuel products, even if they lead to greenhouse gas emissions; and does not authorize recovery of damages or equitable abatement remedies against producers for those activities. It is a gross misrepresentation to argue that the State seeks emissions standards for sources worldwide, when the Complaint expressly seeks only monetary remedies and abatement of the nuisance within Rhode Island's borders via adaptation

and mitigation measures. The relief sought would not impact the rights of *any* source permitted under the Act or otherwise interfere with the Act's regulatory framework. Put simply, the CAA lacks a cause of action for the conduct and injuries described in the Complaint.

Even if the State's claims could impact sources under the Act (which they will not), a comprehensive regulatory scheme does not by its very nature amount to complete preemption. To determine whether a claim is completely preempted, "the critical question is whether federal law provides an exclusive substitute federal cause of action that a federal court (or possibly a federal agency) can employ for the kind of claim or wrong at issue." *Fayard v. Ne. Vehicle Servs., LLC*, 533 F.3d 42 (1st Cir. 2008). In *Fayard*, the plaintiff asserted claims in state court against railroad companies for interference with use and enjoyment of property through noise, bright lights and emission of diesel fumes. The First Circuit held that while the Interstate Commerce Commission Termination Act extensively regulated railroads, it was "far from clear that [it] provides private redress for the kind of nuisance claims" the plaintiff advanced. *Id.* at 47. "[I]n the absence of such a clear-cut federal cause of action," the First Circuit found, "there are good reasons… to refuse to extend complete preemption beyond its current boundaries." *Id.* at 48. Similarly, here the CAA's lack of a private right to compensatory damages for wrongful marketing and promotion of a defective product is not merely a lack of coextensive remedies, as Defendants suggest (Opp. 48 (citing *Fayard*, 533 F.3 at 46)), but the nonexistence of a substitute federal cause of action.

The Iowa Supreme Court emphasized this very distinction in *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58 (Iowa 2014). *See* Mot. 23–24. The court held that unlike the generalized, prospective remedies available under in the CAA, which "deal with general emissions standards to prospectively protect the public," common law actions "retrospectively focus on individual tort remedies . . . for actual harms." *Id.* at 69. For these same reasons, application of complete preemption here is not warranted because it would leave the State without a cause of action for the injuries the State has suffered and will continue to suffer because of Defendants' conduct. The interest in preserving the State's state law claims is particularly compelling here, because the

claims do not implicate emissions from any particular source but instead Defendants' wrongful marketing and promotion of their products.

Nor can Defendants satisfy the "no other legal duty" prong, because, unlike the CAA, Rhode Island law imposes a duty to not promote and sell products that cause a nuisance or that are unreasonably dangerous. *See, e.g.*, *Castrignano v. E.R. Squibb & Sons, Inc.*, 546 A.2d 775, 783 (R.I. 1988) (recognizing cause of action based on strict products liability in tort for injuries incurred in utero by mother's ingestion of prescription drug diethylstilbestrol).

Defendants' inflated portrayal of the CAA's scope is dispelled by cases that allowed state law claims for deceptive marketing against manufacturers, even where those products caused emissions regulated under the Act. *See* Mot. 19–20. In *In re Volkswagen "Clean Diesel" Litig.*, No. CL-2016-9917, 2016 WL 10880209 (Va. Cir. Ct. 2016) ("*Volkswagen*"), and *Counts v. Gen. Motors, LLC*, 237 F. Supp. 3d 572 (E.D. Mich. 2017), vehicle owners asserted state law claims for deceptive advertising and fraud against manufacturers based on false claims about emissions performance. The defendants argued that the CAA preempted such claims under 42 U.S.C. § 7543(a), which prohibits states from "enforce[ing] any standards relating to the control of emissions from new motor vehicles." Rejecting the defense, the courts held that the state tort claims arose out of tortious behavior beyond the mere control of emissions. *Volkswagen*, 2016 WL 5347198, at *5–6 (distinguishing state law claims based on tortious behavior beyond alleged noncompliance with emissions standards); *see also Counts*, 237 F. Supp. 3d at 591–92 (no preemption where "the gravamen of Plaintiffs' claims, like in *Volkswagen*, focus on 'the deceit about compliance, rather than the need to enforce compliance.'"). These cases highlight the distinct legal duties in deceptive marketing claims, as opposed to claims from emissions standards, permits, or control.[13]

---

[13] In contrast to *Volkswagen* and *Counts*, in *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 264 F. Supp. 3d 1040, 1057 (N.D. Cal. 2017), the court held that Wyoming was preempted from enforcing its SIP provisions in a way that effectively attempted to enforce a "standard relating to the control of emissions from new motor vehicles," in violation of 42 U.S.C. § 7543(a), a portion of the CAA that is entirely inapplicable here.

Because the State's claims fall outside the scope of the Act, the procedures for challenging EPA actions set out in 42 U.S.C. § 7607(e), to which Defendants allude (Opp. 45), are irrelevant. Defendants' cases—neither of which concern complete preemption, but instead, ordinary preemption—do not hold otherwise. In *California Dump Truck Owners Ass'n v. Nichols*, 784 F.3d 500, 507 (9th Cir. 2015), the plaintiff, "as a practical matter," challenged EPA's approval of a provision of California's Clean Air Act State Implementation Plan. Similarly, in *New England Legal Found. v. Costle*, 666 F.2d 30, 31–32 (2d Cir. 1981), the nuisance claim was "in effect, an attack upon the validity of the EPA-approved variance" to a SIP and was subject only to the procedures set out in 42 U.S.C. § 7607(e). The present lawsuit, in contrast, does not challenge any action taken by the EPA; EPA has not approved Defendants' practices for marketing or promotion of fossil fuels, nor could it for the simple reason that such practices are outside the scope of the Act.[14, 15]

### 2. Defendants' Ordinary Preemption Arguments Do Not Give Rise to Removal Jurisdiction.

Even if the State's claims fell within the scope of the CAA, which they do not, Defendants' arguments founder on the cases cited in the State's Motion—all of which either reject that the CAA completely preempts state law nuisance claims against point sources, or reject ordinary preemption of such claims. *See* Mot. 34 & nn. 17 & 18. Attempting to distinguish those cases, Defendants argue that they applied the law of the source state and emphasize that under the "source state rule," plaintiffs are preempted from bringing nuisance claims under the law of state in which the injury occurs. Opp. 46–47. But as explained in Part III.A.1.c, *supra*, the source state rule is an ordinary preemption argument, and ordinary preemption "is merely a defense and is not a basis for

---

[14] *Danca v. Private Health Care Sys., Inc.*, 185 F.3d 1 (1st Cir. 1999) does not support application of complete preemption under the CAA. Opp. 45. *Danca* addressed the Employee Retirement income Security Act ("ERISA"), which is one of the few statutes that the Supreme Court has found evidenced Congressional intent to completely preempts state law actions. *See id.* at 7 (citing *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 658 (1995)).

[15] Defendants' note 24 is irrelevant. The State does not argue that the Act provides only administrative relief.

removal." *Fayard*, 533 F.3d at 45. Defendants cite no case where a court found *complete* preemption under the CAA, and the State is aware of none.

Defendants' arguments that the CAA's savings clauses, 42 U.S.C. §§ 7416 & 7604(e), are of no import here (Opp. 47–48) also conflate complete preemption with ordinary preemption. Indeed, *North Carolina ex rel Cooper*, cited by Defendants, explicitly refers to "field and conflict preemption," two ordinary preemption principles that are irrelevant to complete preemption. Opp. 47–48. In allowing state law claims against permitted emitters, courts have relied on the Act's express savings clauses, which emphasize the primary role of the state common law in the preservation of air quality. *See, e.g.*, *Merrick*, 805 F.3d at 690 ("The states' rights savings clause of the Clean Air Act expressly preserves the state common law standards on which plaintiffs sue."); *Bell*, 734 F.3d at 190–91 (finding no preemption of state tort claims after considering the CAA savings clauses). Defendants' citation to *AEP* does not negate the cooperative federalism framework established by the CAA, but instead highlights congressional intent for federal air pollution regulation conducted "in combination with state regulators." *AEP*, 564 U.S. at 427. That the Act envisions states as primarily responsible for maintaining air quality undermines arguments in favor of finding congressional intent to completely preempt these state law claims, even if state responsibility is exercised in tandem with EPA. *See* Mot. 35 (citing 42 U.S.C. § 7401(a) (3)).

### D. The Claims Are Not Based on Defendants' Activities on Federal Lands or at the Direction of the Federal Government.

#### 1. There Is No Outer Continental Shelf Lands Act Jurisdiction.

The harms the State has suffered were not caused by "injurious physical acts" on the Outer Continental Shelf ("OCS"). *Par. of Plaquemines v. Total Petrochem. & Ref. USA, Inc.*, 64 F. Supp. 3d 872, 895 (E.D. La. 2014); *Tennessee Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 154 (5th Cir. 1996) (defining "operation" as "the doing of some physical act" on the OCS). The injuries arise from the nature of Defendants' fossil fuel products no matter where they are extracted, and Defendants' promotion of them—not from the physical acts any Defendant conducted on the OCS. *See Parish of Plaquemines*, 64 F. Supp. 3d at 894–96 (no Outer Continental Shelf Lands Act ("OCSLA") jurisdiction over pollution claims from oil and gas exploration and production in

Louisiana waters, even though some claims "involved pipelines that ultimately stretch to the OCS"); *see also* Mot. 42, n.19 (collecting cases).

Defendants go to significant lengths to show that large volumes of oil and gas have been produced from the OCS. Opp. 50, n.25; Declaration of Joshua S. Lipshutz, Dkt. 88, ("Lipshutz Decl.") ¶ 17 & Ex. 15, Dkt. 88-15; Declaration of J. Keith Couvillion, Dkt. 90, ¶¶ 6, 9, 12 & Ex. C, Dkt. 90-03. But Defendants go only so far as to say "some portion of the alleged injuries would not have occurred absent Defendants' operations on the OCS." Opp. 51, n.26. "Some portion" does not establish "but for" causation; the State would still have suffered harm without extraction on the OCS. This partial attribution is insufficient to meet Defendants' burden on a motion for remand. *See* Mot. 42, n.19; *San Mateo*, 294 F. Supp. 3d at 938–39 (rejecting OCSLA removal jurisdiction where defendants failed to show plaintiffs' injuries "would not have accrued *but for* the defendants' activities on the [OCS]"). The method of producing fossil fuel products is immaterial to the State's claims, and Defendants' arguments would "open the floodgates to cases that could invoke OCSLA jurisdiction far beyond its intended purpose." *Plaquemines Par. v. Palm Energy Offshore, LLC*, No. CIV.A. 13-6709, 2015 WL 3404032, at *5 (E.D. La. May 26, 2015).

*Hammond v. Phillips 66 Co.*, No. 2:14CV119-KS-MTP, 2015 WL 630918 (S.D. Miss. Feb. 12, 2015), is instructive on this point. The plaintiff there alleged that he suffered asbestosis and related lung disease from exposure to the defendant manufacturers' asbestos-containing products. *Id.* at *1. The defendants removed under OSCLA, arguing that the plaintiff was exposed to asbestos while working on a semi-submersible on the OCS. *Id.* The plaintiff alleged, however, that he spent only nine months of his ten years in the industry employed on the OCS. *Id.* at *3. Because "asbestosis is a cumulative and progressive disease," the court was "unable to conclude that 'a "but-for" connection' exist[ed]" between the plaintiff's injury and his time working on the OCS, and therefore "resolving all doubts regarding the propriety of removal in favor of remand," the court granted remand. *Id.* The court expressly distinguished *In re Deepwater Horizon*, where "it was 'undeniable'" that the pollutants that injured the plaintiff migrated directly from a facility operating on the OCS, and found instead that jurisdiction was inappropriate "given the uncertainty

regarding whether [plaintiff's] working offshore for less than one year could have caused him to develop asbestosis." *Id.*[16]

As in *Hammond*, Defendants' burden here is to establish that the State would not have been injured but-for Defendants' OCS "operations." Defendants proffer purports to show that "substantial volumes" of oil and gas have been extracted from the OCS over time, but does not quantify any contribution to the State's injuries, let alone argue that the State would not have been injured but-for Defendants' OCS "operations."

### 2. The State's Claims Do Not "Arise" Within the Federal Enclave.

a. The State's Claims "Arise" Where the State Has Been Injured—on Non-Federal Land.

None of the State's claims "arose on" a federal enclave. *See* Mot. 43–47. Defendants' argument that mere references in the Complaint to "Rhode Island's coast," necessarily mean the State seeks to recover for injuries to federal property within its borders. Opp. 55. This theory is specious: the State explicitly disclaims any action for climate change-related injuries arising on federal land. *See* Compl. ¶¶ 1, n. 2 & 12; Mot. 43; *see also Washington v. Monsanto Co.*, 274 F. Supp. 3d 1125, 1132 (W.D. Wash. 2017), *aff'd on other grounds*, 2018 WL 4523988 (9th Cir. Sept. 21, 2018) (because plaintiff State of Washington "assert[ed] that it does not seek damages for contamination to . . . land within federal territory,. . . none of its claims arise on federal enclaves").[17] Resolving all doubts in favor of remand, as the Court must, *e.g.*, *Rosselló-González*,

---

[16] Defendants' contrary citation to *Ronquille v. Aminoil Inc.*, No. CIV.A. 14-164, 2014 WL 4387337, at *2 (E.D. La. Sept. 4, 2014), is also inapposite. There, the asbestos plaintiff alleged that his exposure occurred "as a result of his work at [defendant's] land base," but it was undisputed that his work was done "on and in support of . . . structures and materials" that were ultimately used on OCS platforms. The court found, with no discussion, that because the *only* alleged source of exposure was necessarily directly related to OCS operations, there was a "sufficient connection" to satisfy the but-for test. *Id.* Here, by contrast, it is undisputed that the large majority of Defendants' production, and all of their marketing, promotion, and disinformation campaign, were wholly unrelated to operations on the OCS.

[17] The State disclaimed on the record any damages for injuries occurring on federal lands in Rhode Island. Compl. ¶¶ 1, n. 2 & 12; Mot. 43. In view of those statements, Defendants' argument that the Complaint citations to reports discussing federal lands implies an effort to recover for injuries on federal enclaves necessarily fails. *See Washington*, 274 F. Supp. 3d at 1132 (State's *avowal* that it would not seek recovery for injuries to federal territory satisfied court that enclave jurisdiction inappropriate). Defendants' recital of

398 F.3d at 11, all of the injuries as alleged in the Complaint have occurred and will occur on non-federal land, and the State's claims therefore arise outside the federal enclave. *Accord San Mateo*, 294 F. Supp. 3d at 939.[18]

> b. Defendants Cannot Show "All Pertinent Events" Occurred on a Federal Enclave.

Defendants' argument that enclave jurisdiction exists where "pertinent events" occurred within the federal enclave misstates the law. Where tortious activities "allegedly occur partially inside and partially outside the boundaries of an enclave," defendants bear a "higher burden" because "the state's interest increases proportionally, while the federal interest decreases." *Ballard v. Ameron Int'l Corp.*, No. 16-CV-06074-JSC, 2016 WL 6216194, at *3 (N.D. Cal. Oct. 25, 2016). Defendants have not shown that all or even a substantial portion of the conduct that allegedly harmed the State occurred within the federal enclave, and a proper reading of the Complaint shows that the vast majority of Defendants' bad conduct occurred outside it.

Defendants' cited cases stand at most for the proposition that enclave jurisdiction will lie where "*all* pertinent events," *Rosseter v. Indus. Light & Magic*, No. C 08-04545 WHA, 2009 WL 210452, at *2 (N.D. Cal. Jan. 27, 2009) (emphasis added), or at least "*the vast majority* of the alleged [tortious] acts," *Klausner v. Lucas Film Entm't Co.*, No. 09-03502 CW, 2010 WL 1038228, at *4 (N.D. Cal. Mar. 19, 2010) (emphasis added), occurred within the federal enclave. Indeed,

---

federal enclaves (*see* Opp. 53–55; 54 n.27)—none of which the Complaint identifies as a site injury or injurious conduct—has no bearing on the validity of that disclaimer.

[18] Defendants' attacks on the State's cited cases are equally inapplicable. *Totah* is not confined to defamation claims Defendants that court found that torts arise for federal enclave purposes where "'last event necessary to render the *tortfeasor* liable'" took place. Opp. 55 n.28 (citing *Totah v. Bies*, No. C 10-05956 CW, 2011 WL 1324471, at *2 (N.D. Cal. Apr. 6, 2011) (emphasis added)). Defendants fail to distinguish *Bordetsky v. Akima Linguistics Servs., LLC*, No. CV 14-1786 (NLH/JS), 2016 WL 614408 (D. N.J. Feb 16, 2016), in which the court remanded where it was unquestioned that the injury arising from the underlying assault—let alone any other element relating to negligence—occurred on private property. *Amtec Corp. v. U.S. Centrifuge Sys., L.L.C.*, No. CV-12-RRA-1874-NE, 2012 WL 12897212 (N.D. Ala. Dec. 6, 2012), *objections overruled sub nom. Amtec Corp. v. US Centrifuge Sys. LLC*, No. 5:12-CV-1874-RRA, 2013 WL 12147712 (N.D. Ala. May 29, 2013)., stands for the general rule that in determining where a claim arises for federal enclave jurisdictional purposes, courts look to the state law that created the claim. In Rhode Island, torts arise where injury occurs—here, in Rhode Island. Mot. 46.

each of these cases cites *Snow v. Bechtel Const. Inc.*, 647 F. Supp. 1514, 1521 (C.D. Cal. 1986), in which it was "concede[d]" that "*all* pertinent events occurred on a federal enclave" (emphasis added) and therefore federal jurisdiction existed over the action. None of these cases support the position Defendants advocate—that federal jurisdiction is implicated even where, as here, all or the vast majority of the allegedly tortious conduct occurs *outside* the federal enclave.[19]

The Complaint contains no allegation that any "pertinent event" occurred within a federal enclave, including the District of Columbia; at most, Defendants have shown that one Defendant operated at the Elk Hills Naval Petroleum Reserve for some period of time, and that one Defendant sold oil and gas to the Navy Exchange Service Command. *See* Opp. 53–54 (citing Compl. ¶¶ 166–67, 177); *see also* Mot. 44–45. Instead, the overwhelming majority of the conduct at issue occurred on non-federal land—in Defendants' corporate offices, research facilities, and production facilities outside the federal enclave. *Cf. Ballard*, 2016 WL 6216194, at *3 (remanding state law asbestos-related claims where plaintiff had worked for defendant on military base, but asbestos exposure there was "just a small portion of the total exposure: one of 17 locations and during six months of the years-long exposure period"). Even under Defendants' "pertinent acts" theory—which is not the correct standard—Defendants have not met their burden.

### E. Defendants Were Not "Acting Under" Federal Officers in Their Tortious Conduct.

To invoke federal officer removal, private companies bear a "special burden" to establish that (1) they acted under the government's "subjection, guidance, or control," *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 151 (2007), and (2) there was a "sufficient causal nexus" between the plaintiff's claims and the conduct done under federal control, *Hilbert v. Aeroquip,*

---

[19] Nor do *Corley v. Long-Lewis, Inc.*, 688 F. Supp. 2d 1315, 1328–29 (N.D. Ala. 2010), and *Reed v. Fina Oil & Chem. Co.*, 995 F. Supp. 705 (E.D. Tex. 1998), support Defendants' position. In *Corley*, the court emphasized that a substantial amount of plaintiffs' exposure to asbestos occurred on federal enclaves, and found removal proper because the injury occurred on federal enclaves. *Id.* In *Reed*, the plaintiff alleged a "single, indivisible [toxic exposure] injury" while working at a manufacturing plant, which for a portion of plaintiff's tenure was a federal enclave. *Id.* at 710, 713. Because a substantial portion of the injury occurred on a federal enclave and plaintiff did not distinguish between exposure before and after the plant became private, the court was compelled to find jurisdiction. *Id.* at 713.

*Inc.*, 486 F. Supp. 2d 135, 143 (D. Mass. 2007) (quoting *Freiberg v. Swinerton & Walberg Prop. Servs., Inc.*, 245 F. Supp. 2d 1144, 1150 (D. Colo. 2002)). The various contractual agreements with the federal government Defendants offer do not demonstrate either element. Confronting the exact same exhibits Defendants offer here, the *San Mateo* court properly concluded that the defendants' "dubious assertion of federal officer removal" failed because the defendants had "not shown a 'causal nexus' between the work performed under federal direction and the plaintiffs' claims, which are based on a wider range of conduct." 294 F. Supp. 3d at 939.

Nor do Defendants demonstrate that "the Government itself would have had to perform" the culpable conduct that caused the State's injuries in Defendants' absence. *See Watson*, 551 U.S. at 153–54. Defendants' evidence at best shows mutually beneficial procurement contracts and leases that allow them to profit privately from the exploitation of public resources. Nothing in these materials demonstrates government control over the Defendants' boardroom decisions to withhold information about the dangers inherent in their products. Defendants point to no evidence that the government would have directed them to do so, or would have done so itself.[20]

### 1. Standard Oil's Operations Under the Elk Hills Reserve Contract Have No Causal Nexus to the State's Injuries.

Defendants rely heavily on the Unit Plan Contract ("UPC") between Chevron's predecessor Standard Oil and the U.S. Navy to argue that Standard Oil acted under a federal officer. But the UPC was just that—a negotiated contract governing the rights of Standard Oil and the Navy in a shared oil field. The Elk Hills Reserve was "expressly made subject to pre-existing

---

[20] Defendants' citations are distinguishable from the facts here. In *Benson v. Russell's Cuthand Creek Ranch, Ltd.*, 183 F. Supp. 3d 795, 198–99 (E.D. Tex. 2016), the National Resources Conservation Service ("NRCS") partnered with the defendant to construct levees and perform other tasks pursuant to NRCS's mandated Wetland Reserve Program. The court found that the defendant "was a partner with NRCS and in many ways stood fully in the place of the government" in executing plans under the Wetland Reserve Program, which were controlled in every detail by the government, and which the government would have had to do absent the defendant's participation. *Id.* at 802. Similarly, *Takacs v. Am. Eurocopter, L.L.C.*, 656 F. Supp. 2d 640, 643 (W.D. Tex. 2009), stemmed from the crash of a United States Customs and Border Protection ("CBP") helicopter manned by government personnel. The defendant helicopter company was "responsible for performing program management, aircraft maintenance, logistics, supply, and electronic data processing support to ensure that CBP's aircraft are operational and ready," which the court found with "little doubt" assisted CBP in its duties and provided services CBP otherwise would have performed itself. *Id.* at 645. Those facts are a far cry from Defendants' contentions here.

private ownership," and the contract settled the government and Standard Oil's respective ownership in the oil field. *See United States v. Standard Oil Co. of California*, 545 F.2d 624, 626 (9th Cir. 1976); Not. of Rem. Ex. D § 2(d). This type of agreement "was at that time and still is a common arrangement in the petroleum industry where two or more owners have interests in a common pool." *Id.* In "consideration for Standard curtailing its production" to retain the oil reserve for a time of emergency, Standard was permitted under the contract to extract the lesser of 25 million barrels or one-third of its owned interest in the reserve's "Shallow Oil Zone." *Standard Oil Co. of California*, 545 F.2d at 627–28.

The UPC's terms fall far short of demonstrating the control that gives rise to federal officer jurisdiction, and the contract grants far more freedom than Defendants admit. First, the UPC does not *require* production of 15,000 barrels of oil per day from the reserve as Defendants assert. Opp. 58. To the contrary, it requires that the reserve be "developed and operated in a manner and to such extent as will . . . *permit* production . . . at a rate sufficient to produce therefore not less than 15,000 barrels per day." Not. of Rem. Ex. D § 4(b). Next, it explains that "Standard shall be *permitted* to receive from production . . . 15,000 barrels of oil per day," until certain conditions were met. *Id.* at Ex. D § 5(d). That is, 15,000 barrels of oil per day was essentially the in-kind rate at which Standard would be compensated under the contract, until its ceiling was reached. Rather than mandating minimum production, the contract represented a *curtailment* of Standard's production. Standard could have complied with the contract by producing no oil at all. Mot. 52.

Other terms also make clear that Standard was not compelled to manage and develop the reserve in place of the government. For example, the "Operating Committee" supervising "exploration, prospecting, development, and producing operations on the Reserve" consisted of "two petroleum engineers, one of whom shall be appointed by and shall represent Navy, and the other shall be appointed by and represent Standard." *Id.* § 3(b). If either party desired to drill an exploratory well, the proposal went first before an Engineering Committee composed of three representatives from Standard and three from the Navy, any non-unanimous decision of which was reviewable by the Secretary of the Navy. *Id.* § 4(e)(1), (e)(2). If the Secretary denied the proposal,

"the party proposing the drilling of such well shall, notwithstanding such determination, be entitled to have such well drilled but the cost of drilling and equipping such well shall be borne solely be such party." *Id.* Finally, Standard had "the right to take delivery, and make such disposition, of the production allocated to it [t]hereunder as it may desire," and "[n]either Navy nor Standard [had] any preferential right to purchase any portion of the other's share of such production." *Id.* § 7.

Critically, none of the aspects of the Elk Hills Reserve over which the Navy *did* exert control—principally its decision to dramatically *restrict* production from the reserve for more than 30 years—has the necessary "causal nexus" to the State's injuries. The UPC did not require Standard or any Defendant to produce massive volumes of fossil fuel (it in fact *curtailed* production), did not dictate how Standard or any Defendant sold or marketed fossil fuels, and did not require—or in any way even authorize—Standard or any Defendant to withhold known risks inherent in its products. And in any event, the amount of oil Standard may have produced from the Elk Hills Reserve is vanishingly small compared to Defendants' total production, and is too small to satisfy the required "causal connection between its federal mandate and the very actions it now seeks to defend in federal court." *Holdren v. Buffalo Pumps, Inc.*, 614 F. Supp. 2d 129, 149 (D. Mass. 2009) (rejecting federal officer jurisdiction where "that causal nexus is lacking").[21]

### 2. Defendants' Conduct Pursuant to OCSLA Leases or NEXCOM Contracts Was Not Controlled by the Federal Government and Has No Causal Nexus with the State's Injuries.

Defendants' leases of OCS territory for oil and gas production also do not confer federal officer jurisdiction, because they are commercial oil and gas leases that do not direct the conduct

---

[21] *See also, e.g.*, *Meyers v. Chesterton*, No. CIV.A. 15-292, 2015 WL 2452346, at *6 (E.D. La. May 20, 2015) (rejecting federal officer removal because "nothing about the Navy's oversight prevented the defendants from complying with any state law duty to warn"); *New Jersey Dep't of Envtl. Prot. v. Exxon Mobil Corp.*, 381 F. Supp. 2d 398, 404–05 (D.N.J. 2005) (defendant not "acting under" federal officer when improperly *disposing* of toxic substances even though government may have exerted control over defendant's *production* of those materials); *Faulk v. Owens-Corning Fiberglass Corp.*, 48 F. Supp. 2d 653, 663 n.14 (E.D. Tex. 1999) (rejecting federal officer removal and stating that "Defendants can bury this Court in federal government regulations controlling their actions. But if there is no causal nexus between Defendants' actions in response to this control and the Plaintiffs' claims, then the government did not "make them do it" since the "it" was never under government control.").

the State alleges caused its injuries. The leases and leasing scheme at most show that some Defendants have profitably leased federal lands; most critically, they do not show any "effort to assist, or to help carry out, the duties or tasks of [a] federal superior." *Watson*, 551 U.S. at 152. Defendants cite no case where an OCSLA lease was held to give rise to federal officer removal jurisdiction, because no court has ever so held.[22]

More importantly, the terms of the example lease Defendants provide and the regulations they cite do not show that the government required the Defendant lessees to commit the acts that harmed the State: promoting, marketing, and selling massive amounts of fossil fuels knowing those products were dangerous; failing to warn of known risks; and misleading the public regarding those risks. The State does not allege that Defendants' compliance or non-compliance with the terms of any OCS lease caused its injuries. Merely contracting with the government does not give rise to federal officer removal where, as here, the conduct that *caused injury* was in no way directed by the government. *See, e.g.*, *Parlin v. DynCorp Int'l, Inc.*, 579 F. Supp. 2d 629, 635–36 (D. Del. 2008) (remanding state law wrongful death case against contractor providing police services to Department of State in Baghdad, where claim arose from defendant's alleged failure to provide adequate security for job applicants, and defendant did not show alleged tortious behavior was done at government's behest).[23]

The contracts between NEXCOM and Defendant CITGO are commercial contracts for procurement of retail-quality, commodity gasoline and diesel. By their own terms, they call for

---

[22] Defendants' representation that the sample OCSLA lease mandated drilling, Opp. 60, mischaracterizes the text of the lease, which merely requires that the lessee's exploration plan obtain a government blessing before any exploration occurs. *See* Not. of Rem. Ex. C § 9 ("The Lessee shall conduct all operations on the lease or unit in accordance with an approved exploration plan (EP), development and production plan (DPP) or development operations coordination document (DOCD)"). Defendants do not point to an Exploration Plan or other document that mandates drilling.

[23] *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 291–92 (D.C. Cir. 1988), cited at Opp. 62, does not establish that all conduct pursuant to OCSLA leases satisfies "acting under" jurisdiction. That case merely recites the purposes of the OCSLA, but does not show that the government itself would engage in oil and gas exploration on the OCS but for the OCSLA leases. Defendants still are unable to cite any case where a court has found "acting under" jurisdiction based on the presence of an OCSLA lease.

provision of fuel identical or comparable to that sold at retail by CITGO,[24] that "compl[ies] with standard specification for automotive gasoline" and "standard specification for diesel fuel,"[25] and that complies with environmental laws and regulations.[26] The defective nature of Defendants' products, Defendants' failure to warn of known risks, and Defendants' massive production, sale, and wrongful promotion of fossil fuels are not directed by the government's purchase of gasoline and diesel under the NEXCOM contracts.[27]

---

[24] *See* Declaration of Arnold Walton in Support of Defendants' Joint Opposition to Motion to Remand ("Walton Decl."), Dkt. 195, Ex. A, at 13 (CITGO-000012) ("The Contractor must provide high quality product identical to or the same product as supplied [at] the Contractors commercially operated service stations."); *Id.* Ex. B, at 14 (CITGO-000043) ("Gasoline products supplied by CITGO under this contract shall be comparable to gasoline products supplied to other retail gasoline facilities owned, operated, or bearing the same name as CITGO marketed in the same geographic area"); *Id.* Ex. C, at 14 (CITGO-000103 ("The Contractor shall furnish branded motor fuel products of the same type, grade, and octane that are furnished to commercial retail facilities owned, operated, or bearing the same name as the Contractor"); *Id.* Ex. D, at 42 (CITGO-000235) (purchased fuel "shall be comparable to motor fuel products supplied to commercial retail gasoline sales facilities supplied by the Contractor"); *Id.* Ex. E, at 21 (CITGO-000373) (same); *Id.* Ex. F, at 19 (CITGO-000420) (same); *Id.* Ex. G, at 12 (CITGO-000506) (same).

[25] Walton Decl. Ex. D, at 38, 42 (CITGO-000231, 000235) ("Gasoline products provided will comply with 'standard specification for automotive gasoline . . . and diesel fuel with standard specification for diesel fuel"); *Id.* Ex. E, at 21 (CITGO-000373) (same); *Id.* Ex. F, at 19 (CITGO-000420) ("Gasoline and petroleum fuel products will comply with standard specification for automotive gasoline"); *Id.* Ex. G, at 19 (CITGO-000506) (same).

[26] Walton Decl., Dkt. 195, Ex. D, at 38 (CITGO-000243) ("Supplies delivered under this contract shall conform to all federal, state, and local environmental requirements applicable to the geographic location of the receiving activity on the date of delivery."); *Id.* Ex. E, at 20 (CITGO-000372) (same); *Id*. Ex. F, at 18 (CITGO-000419) (same); *Id.* Ex. G, at 12 (CITGO-000506) (same).

[27] Defendants cite *Bailey v. Monsanto Co.*, 176 F. Supp. 3d 853, 870 (E.D. Mo. 2016), for the proposition that a defendant is always "acting under" a government agent when it sells a product "directly to the government." But the *Bailey* court found Monsanto was acting under a government agent "only with respect to the PCBs that Monsanto sold directly to the government, or to others at the direction of the government," not because the government was the buyer, but because "the government *required* the use of PCBs in certain products during the relevant time period." *Id.* The court ultimately granted remand in any event, because the volume of PCBs Monsanto sold to the government constituted just "slightly more than one one-hundredth of a percent" of Monsanto's total PCB sales, which under the circumstances was insufficient to show a causal nexus with the alleged injuries. *Savoie v. Huntington Ingalls, Inc.*, 817 F.3d 457, 465 (5th Cir.), *cert. denied,* 137 S. Ct. 339 (2016), is distinguishable for the same reason. There, the defendant shipyard was subject to "detailed specifications" from the Navy, "that required the use of asbestos," and therefore was acting under its federal superior when it exposed the plaintiff to asbestos, causing his mesothelioma.

### F. This Court Lacks Jurisdiction Under the Bankruptcy Removal Statutes.

#### 1. The State Brings This Action to Enforce Its Police and Regulatory Powers Under Both the Public Policy and Pecuniary Interest Tests.

Bankruptcy jurisdiction expressly does not extend to this exercise of the State's police or regulatory powers. Mot. 54-56; *see also San Mateo*, 294 F. Supp. 3d at 939 (no removal for suit "aimed at protecting the public safety and welfare . . . on behalf of the public."). The State, composed of and acting on behalf of the public, brought this action to recover costs associated with Defendants' defective products' impacts on the State's citizens, infrastructure, and natural resources. *See, e.g.*, Compl. ¶¶ 1, 8, 18, 212. Defendants' only argument—that certain damages the State seeks are evidence of a pecuniary purpose, Opp. 64—ignores the unanimous caselaw explaining that government actions seeking pecuniary relief, including money damages, are not mutually exclusive with exercise of the police power. *See* Mot. 55–56. Here, the State seeks to prevent and/or mitigate statewide injuries to statewide natural resources, public services and infrastructure.

#### 2. The State's Action Is Not "Relate[d] to" Any Bankruptcy Proceedings.

Defendants' recital of the "any conceivable effect" test for "related to" jurisdiction (Opp. 65) is misleading and irrelevant because that test applies only *before* a Chapter 11 bankruptcy plan is confirmed. Here, both Getty Petroleum Marketing, Inc. ("Getty") and Texaco, Inc. ("Texaco") (subsidiary of Defendant Chevron, Inc.) have confirmed plans. *Id.* Defendants do not contest the application of the "particularly close nexus" test to determine post-confirmation "related to" jurisdiction. *See* Mot. 56–58.

Defendants offer no authority that reviewing a discharge provision magically converts exclusively state law tort claims into "substantial questions of bankruptcy law," or that these claims would not have existed without the bankruptcy proceeding. *See In re Ray*, 624 F.3d 1124, 1135 (9th Cir. 2010); *In re Resorts Int'l, Inc.*, 372 F.3d 154, 170 (3d Cir. 2004) (no post-confirmation

jurisdiction over malpractice action against bankruptcy accounting firm).[28] Further, Defendants' argument that the claims are related to Arch Coal, Peabody Energy, and other unidentified Doe defendants' bankruptcy proceedings is similarly specious. *See* Opp. 66. Determining whether a claim is "related to" the bankruptcy plan or proceeding requires a case-by-case analysis based on "the whole picture." *In re Boston Reg'l Medical Center, Inc.*, 410 F.3d 100 (1st Cir. 2005) at 107 (citing *In re Wilshire Courtyard*, 729 F.3d at 1289). Defendants provide no facts, either in their brief or evidentiary proffer (*see* Lipshutz Decl. Exs. 20-22 (describing fossil fuel industry bankruptcy trends)) that Plaintiff's claims "relate to" or raise any question related to Arch, Peabody, or any other unnamed fossil fuel company's confirmed bankruptcy. Such bankruptcies cannot be grounds for removal.

### 3. Equitable Remand Is Appropriate.

28 U.S.C. § 1452(b) compels equitable remand here. Defendants merely incant, to no effect, the axiom that federal courts should decide cases within their jurisdiction, Opp. 66 (citing a case discussing *Younger* abstention, not bankruptcy removal); and allude to hypothetical worldwide ramifications of this case. Opp. 67. They cite no other case supporting their position, nor do they rebut the State's cited cases indicating the propriety of equitable remand. *Messerlian v. A.O. Smith Corp.*, No. C.A. 09-393 S, 2010 WL 308981, at *4 (D.R.I. Jan. 25, 2010) (remanding state law personal injury case where removal was "primarily about defense strategy and not bankruptcy administration"). Most importantly, they make no attempt to refute that every equitable factor weighs in favor of remand here. *See* Mot. 59 (discussing factors present here). Even if bankruptcy removal were proper—which it is not—equity would compel remand.

---

[28] Defendants' cited cases each required elucidation of the underlying bankruptcy plan's terms, and not simply application of its discharge provisions. *In re Wilshire Courtyard*, 729 F.3d 1279 (9th Cir. 2013) was an action by the California Franchise Tax Board challenging the tax implications a reorganization plan; the Tax Board's claims required an interpretation of a property transfer in the plan, and would not have existed in its absence. *In re Pegasus Gold Corp.*, 394 F.3d 1189 (9th Cir. 2005), a breach of contract action, required interpretation of, inter alia, the work agreement the defendant allegedly breached, which was memorialized as part of the bankruptcy plan.

### G. Admiralty Jurisdiction Is Not Grounds for Removal.

#### 1. Admiralty Jurisdiction Alone Cannot Serve as Grounds for Removal.

District courts across the country have overwhelmingly concluded that the 2011 amendments to 28 U.S.C. § 1441 do not affect the longstanding rule that state law claims cannot be removed absent a non-admiralty ground for federal jurisdiction. *See, e.g.*, *Boudreaux v. Global Offshore Res., LLC*, No. 14–2507, 2015 WL 419002, at *3 (W.D. La. Jan. 30, 2015) (collecting cases across circuits and siding with majority holding maritime cases are not removable); *Moreno v. Ross Island Sand & Gravel Co.*, No. 2:13-CV-00691-KJM, 2015 WL 5604443, at *19 (E.D. Cal. Sept. 23, 2015) ("District courts in [the Ninth C]ircuit agree with this majority view."); *Cassidy v. Murray*, 34 F. Supp. 3d 579, 584 (D. Md. 2014) ("The Court is not inclined to reject decades of well-established law to adopt an unsettled attempt to alter the course of removal procedures without clear, binding, precedent."). Defendants cherry pick out-of-circuit district court cases, primarily *Genusa v. Asbestos Corp.*, 18 F. Supp. 3d 773, 790 (M.D. La. 2014) and *Ryan v. Hercules Offshore, Inc.*, 945 F. Supp. 2d 772 (S.D. Tex. 2013), to argue the erroneous proposition that the 2011 amendments upset well-established precedent by allowing for removal of maritime claims. *See* Opp. 67. Defendants ignore that most courts to consider *Ryan* questioned its validity. *E.g. Gonzalez v. Red Hook Container Terminal LLC*, No. 16:CV-5104 (NGG), 2016 WL 7322335, at *3 (E.D.N.Y. Dec. 15, 2016) ("Courts in this jurisdiction and elsewhere have predominantly rejected the *Ryan* interpretation."); *Cassidy,* 34 F. Supp. 3d at 584 (collecting cases).[29]

---

[29] Defendants' attempt to undermine the majority position by citing to *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 371 (1959), is baffling. *Romero* is the seminal case in which the Supreme Court established that admiralty claims were not removable under 28 U.S.C. § 1444 unless there is an independent basis for jurisdiction. *Id.* Indeed, the reasoning underpinning *Romero* has been pivotal in courts' determinations that the 2011 amendments did not disrupt the long-established precedent. *See, e.g.*, *Coronel v. AK Victory*, 1 F. Supp. 3d 1175, 1189 (W.D. Wash. 2014) (citing the "long-standing" precedent and "considerations expressed in *Romero*" in finding the 2011 Amendments did act to allow removal of admiralty claims); *Gregoire v. Enter. Marine Servs., LLC*, 38 F. Supp. 3d 749, 763 (E.D. La. 2014) ("If state court maritime cases were removable under Section 1333, the effect would be tantamount to considering all maritime law claims as part of federal question jurisdiction under Section 1331, eviscerating the saving to suitors clause and undermining the holding and policies discussed at length in *Romero*.").

Defendants fail to cite decisions within the First Circuit, including this Court, that reject the minority view. *See e.g.*, *Messier v. Ace Am. Ins. Co.*, No. 12-CV-892-JD, 2013 WL 5423716, at *3 (D.R.I. Sept. 26, 2013) ("[E]ven if admiralty or maritime jurisdiction exists in this case, that is not a sufficient basis for removal."). The District of Maine has held that, "[t]he general consensus appears to be to the contrary and, moreover, that any arguable ambiguity should be resolved in favor of remand." *Averill v. Fiandaca*, No. 2:17-CV-00287-JDL, 2017 WL 4419242, at *2 (D. Me. Oct. 5, 2017), *report and recommendation adopted,* 2018 WL 283239 (D. Me. Jan. 3, 2018). The court concluded that, "the saving-to-suitors clause permits Plaintiff to elect to pursue state law remedies in state court." *Id.* at *3.

## 2. The State's Claims Are Not Governed by Admiralty.

Admiralty law was "designed and molded to handle problems of *vessels* relegated to ply the waterways of the world." *Exec. Jet Aviation, Inc. v. City of Cleveland, Ohio*, 409 U.S. 249, 269 (1972). Far from addressing problems of vessels, the State's claims arise out of Defendants' wrongful marketing and promotion of fossil fuels. Compl. ¶ 1. Defendants cannot satisfy either the "location" test or the "substantial relationship to traditional maritime activity" tests required under *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995).

The location test requires that the "tort occurred on navigable waters" or if "injury suffered on land was caused by a vessel on navigable water." *Grubart*, 513 U.S. at 534. Defendants do not dispute that the torts here occurred on land, nor can they because the location of a tort for purposes of admiralty jurisdiction is "the place where the injury occurs." *Tobar v. United States*, 639 F.3d 1191, 1197 (9th Cir. 2011) (quotations omitted). Instead, Defendants argue, under the second prong of the *Grubart* location test, that the injuries suffered by the State are caused by vessels. However, there is no allegation in the Complaint that offshore extraction on vessels (presumably "mobile offshore drilling units" ("MODUs")) is the proximate cause of the State's injuries on land. That some unspecified amount of fossil fuels were extracted via MODUs, as opposed to any other method of extraction, is irrelevant to the State's claim.

Defendants also fail to meet *Grubart*'s "connection to maritime activity" test, which

requires that "the *general character of the activity* giving rise to the incident show[] *a substantial relationship* to traditional maritime activity." 513 U.S. at 533–34 (emphasis added) (quotations omitted). That oil and gas production from a vessel *may* be in certain circumstances a traditional maritime activity, does not mean that in this the "general character" of Defendants' tortious conduct is "substantially related" to traditional maritime activity. For example, in *In re Katrina Canal Breaches Litig.*, 324 F. App'x 370, 380 (5th Cir. 2009), the Fifth Circuit found that a flooding injury caused by a vessel associated with a canal dredging project was "wholly fortuitous" and could have resulted from the same efforts being performed from land, and thus did not implicate "the expertise of an admiralty court as to navigation or water-based commerce." In reaching its conclusion, the court emphasized that the plaintiffs did "not raise issues of navigation or the more traditional maritime activities," nor did they "allege injuries to seamen" or "claim a violation of a duty to provide a safe workplace aboard a vessel." Analogously, the State's injuries from Defendants' tortious conduct are wholly independent from the specific means of extraction selected by the Defendants—the State's injuries would have occurred whether fossil fuels were extracted offshore or on land. [30] In sum, Defendants scurry to admiralty jurisdiction as a lifeboat for their sinking removal ship, but it cannot save them.

## IV.    CONCLUSION

For the reasons explained above, this Court lacks jurisdiction over this action, and should remand it to the Rhode Island Superior Court.

---

[30] Despite Defendants' reliance on outdated case law (Opp. 69, n.41), the Fifth Circuit has accepted that "[t]he Supreme Court has stated in no uncertain terms that 'exploration and development of the Continental Shelf are not themselves maritime commerce,'" *Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 216 (5th Cir. 2013) (quoting *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 425 (1985)). Indeed, the Fifth Circuit's "case law reflects that incidents which occur as a result of offshore drilling are . . . generally not maritime in nature." *Id.* (collecting cases).

Dated: October 5, 2018

**STATE OF RHODE ISLAND**
PETER F. KILMARTIN, ATTORNEY GENERAL
By his Attorneys,


*/s/ Neil F.X. Kelly*
Neil F.X. Kelly
Assistant Attorney General and Deputy Chief of the Civil Division (Bar No. 4515)

Rebecca Partington
Assistant Attorney General and Chief of the Civil Division (Bar No. 3890)

**DEPARTMENT OF THE ATTORNEY GENERAL**

150 South Main Street
Providence, RI 02903
Tel. (401) 274-4400
nkelly@riag.ri.gov
rpartington@riag.ri.gov


Victor M. Sher, *pro hac vice*
Matthew K. Edling, *pro hac vice*

**SHER EDLING LLP**

100 Montgomery Street, Suite 1410
San Francisco, CA 94104
Tel: (628) 231-2500
vic@sheredling.com
matt@sheredling.com

# CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2018, the foregoing document was filed electronically and is available for viewing and downloading through the ECF system. Notice of this filing will be sent electronically to the registered participants identified on the Notice of Electronic Filing.

/s/ Neil F.X. Kelly
Neil F.X. Kelly

John A. Tarantino
Adler Pollock & Sheehan P.C.
One Citizens Plaza
8th Floor
Providence, RI 02903
274-7200
Fax: 351-4607
Email: jtarantino@apslaw.com

Nicole J. Benjamin
Adler, Pollock & Sheehan, PC
One Citizens Plaza
8th Floor
Providence, RI 02903
274-7200
351-4607 (fax)
nbenjamin@apslaw.com

Philip H. Curtis
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
212-836-8000
212-836-8689 (fax)
philip.curtis@arnoldporter.com

Patricia K. Rocha
Adler Pollock & Sheehan P.C.
One Citizens Plaza
8th Floor
Providence, RI 02903
274-7200
Fax: 351-4607
Email: procha@apslaw.com
Matthew T. Heartney
Arnold & Porter Kaye Scholer LLP

777 South Figueroa Street
44th Floor
Los Angeles, CA 90017-5844
213-243-4000
Fax: 213-243-4199
Email:
matthew.heartney@arnoldporter.com

Nancy G. Milburn
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
212-836-8000
Fax: 212-836-8689
Email: nancy.milburn@arnoldporter.com

*Attorneys for Defendant BP Products
North America, Inc.*

Theodore J. Boutrous, Jr.
Gibson, Dunn & Crutcher
333 South Grand Avenue
Los Angeles, CA 90071-3197
213-229-7804
213-229-6804 (fax)
tboutrous@gibsondunn.com

Gerald J. Petros
Robin-Lee Main
Ryan M. Gainor
Hinckley Allen & Snyder
100 Westminster Street
Suite 1500
Providence, RI 02903-0819
274-2000
Fax: 277-9600
Email: gpetros@hinckleyallen.com
Email: rmain@hinckleyallen.com
Email: rgainor@hinckleyallen.com

Joshua S. Lipshutz
Gibson, Dunn and Crutcher
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
202-955-8217
Fax: 202-530-8217
Email: jlipshiz@gibsondunn.com

Neal S. Manne
Susman Godfrey LLP
1000 Louisiana Street
Suite 5100
Houston, TX 77002
713-653-7827
Fax: 713-654-6666
Email: nmanne@susmangodfrey.com

*Attorneys for Defendant Chevron Corp.*
and *Chevron USA, Inc.*

Lauren Motola-Davis
Lewis Brisbois Bisgaard & Smith LLP
1 Turks Head Place
Suite 400
Providence, RI 02903
401-406-3313
Fax: 401-406-3312
Email:
Lauren.MotolaDavis@lewisbrisbois.com

Samuel A. Kennedy-Smith
Lewis, Brisbois, Bisgaard & Smith, LLP
1 Turks Head Place
Suite 400
Providence, RI 02903
617-861-7974
Email: samuel.kennedy-
smith@lewisbrisbois.com

*Attorneys for Lukeoil Pan Americas LLC*

Jeffrey B. Pine
Lynch & Pine, Attorneys at Law
One Park Row
Fifth Floor
Providence, RI 02903
401-274-4400
Fax: 401-274-3326
Email: jpine@lynchpine.com

*Attorney for Marathon Oil Corporation*

Robert D. Fine
Chace, Ruttenberg & Freedman, LLP
One Park Row
Suite 300
Providence, RI 02093
453-6400
Fax: 453-6411
Email: rfine@crfllp.com

David C. Frederick
Kellogg, Hansen, Todd, Figel &
Frederick, PLLC
1615 M Street NW
Suite 400
Washington, DC 20036
202-326-7900
Fax: 202-326-7999
Email: dfrederick@kellogghansen.com

Elizabeth A. Kim
Jerome C. Roth
Munger, Tolles & Olson, LLP
560 Mission Street
27th Floor
San Francisco, CA 94105
415-512-4010
Fax: 415-664-6910
Email: elizabeth.kim@mto.com
Email: jerome.roth@mto.com

Douglas J. Emanuel
Chace, Ruttenberg & Freedman, LLP
One Park Row
Suite 300
Providence, RI 02093
453-6400
Fax: 453-6411
Email: demanuel@crfllp.com

*Attorneys for Defendant Shell Oil
Products Company, LLC*

Ann Marie Mortimer
Hunton Andrews Kurth LLP
550 South Hope Street
Suite 2000
Los Angeles, CA 90071
(213) 532-2103
Fax: (213) 312-4752
Email: AMortimer@HuntonAK.com

Jeffrey B. Pine
Lynch & Pine, Attorneys at Law
One Park Row
Fifth Floor
Providence, RI 02903
401-274-4400
Fax: 401-274-3326
Email: jpine@lynchpine.com

Shannon S. Broome
Hunton Andrews Kurth LLP
50 California Street
San Francisco, CA 94111
415-975-3718
Fax: 415-975-3701
Email: SBroome@HuntonAK.com
Shawn Patrick Regan
Hunton Andrews Kurth LLP
200 Park Abenue
New York, NY 10166
212-309-1046
Fax: 212-309-1100
Email: SRegan@HuntonAK.com

*Attorneys for Marathon Petroleum Corp.,
Marathon Petroleum Company, LP* and
*Speedway, LLC*